**MOUNT SINAI HOSPITAL OF GREATER MIAMI, INC., Plaintiff,**

v.

**Caspar W. WEINBERGER, Secretary of Health, Education and Welfare and Blue Cross of Florida, Inc., Defendants.**

**No. 73–804–Civ–JLK.**

United States District Court,
S. D. Florida,
Feb. 6, 1974.

5. Memorandum, Associate Commissioner, Operations to All District Directors, et al., July 17, 1972, p. 1.

---

James G. Roth, Broad & Cassel, Miami Beach, Fla., for plaintiff.

Kelly, Black, Black & Kenny, P. A., Miami, Fla., for defendant Blue Cross of Fla.

JAMES LAWRENCE KING, District Judge.

Plaintiff Mount Sinai Hospital brought this action to contest the defendants' right to recover some $6 million in Medicare payments received between 1966 and 1972 for services that the Government has since decided were not covered by the Medicare program. The case presents substantial questions about the scope of Governmental authority and the power of the courts to control its exercise, the decision of which will have important consequences for the administration of the Medicare program and the local community which the hospital serves.

Plaintiff is a non-profit facility located in Miami Beach, Florida, a popular retirement haven for senior citizens from across the nation, a large percentage of whom are Medicare beneficiaries.

Since the inception of the program following enactment of the Social Security Amendments of 1965 (Medicare amendments),[1] the lion's share of Mount Sinai's services have understandably been devoted to meeting the needs of the great number of Medicare recipients in the surrounding community. As even defendants have recognized, Mount Sinai in 1971 received the highest daily income from Medicare of any hospital of comparable size in the United States, and submitted claims to the program the following year for more services than any other facility in the Southeast, irrespective of size.[2]

Mount Sinai has been an institution authorized to furnish Medicare services since the program began on July 1, 1965. To qualify as such a "provider of services," the hospital was required to agree not to charge Medicare beneficiaries for its services, but to accept payment from the Federal Hospital Insurance Trust Fund.[3] Payments were made by defendant Blue Cross of Florida, nominated by Mount Sinai to serve as its "fiscal intermediary," and acting by agreement with the defendant Secretary of the Department of Health, Education and Welfare as his agent in administering the program.[4] From 1966 through 1971, Blue Cross apparently reviewed and allowed, with few exceptions, the bills it received from Mount Sinai for Medicare services rendered during that period.

Plaintiff's problems with Medicare began in the summer of 1972 when Blue Cross learned from the Bureau of Health Insurance of the Social Security Administration that charges of overutilization of services covered by the program had been made against Mount Sinai by an area physician. With the assistance of the Florida Medical Foundation Peer Medical Review Committee, Blue Cross and the Bureau proceeded to review some 700 patient charts for the

---

1. Social Security Amendments of 1965, Pub. L.No.89–97, §§ 101–111, 79 Stat. 286, amending 42 U.S.C. § 401 et seq. (1964) (codified at 42 U.S.C. § 1395 et seq. (Supp. I, 1965)).

2. Suspension Order of May 10, 1972, paras. 8, 9, at 12.

3. 42 U.S.C. § 1395cc(a)(1)(A) (1970).

4. 42 U.S.C. § 1395h (1970).

year 1970 as a means of ascertaining whether erroneous payments had been made for services excluded from Medicare coverage and of projecting the amount of such overpayments during the entire period from 1966 to 1972. By affidavit of J. W. Herbert, President of Blue Cross, it is now alleged on the basis of that review that an estimated $6,380,587.40 in claims were improperly paid to Mount Sinai for items or services not covered by the program. Defendants specifically charge that Mount Sinai performed medically unnecessary procedures and that hospital stays were longer than required.

On the basis of its investigation, Blue Cross delivered a written suspension order to plaintiff on May 10, 1973, which stated that 15 percent of the Medicare payments coming due to Mount Sinai for current services would henceforth be withheld so that the trust fund could begin to recover the alleged overpayments. The suspension order was predicated on regulations that became effective May 27, 1972, which detail a procedure for instituting such suspensions where there is "reliable evidence" that an overpayment has been made.[5]

Before the suspension could be implemented, plaintiff brought this action for temporary and permanent injunctive relief, challenging the statutory authority for the suspension order as well as the constitutionality of the procedures prescribed by the suspension regulations for its issuance. An emergency hearing was accordingly convened after notice to all the parties on May 17, 1973.

The evidence presented at the hearing demonstrated that not only Mount Sinai, but the entire community it serves would be irreparably injured by the threatened suspension of Medicare payments. The undisputed testimony indicated that if the suspension order were implemented, Mount Sinai's income could be reduced by as much as $100,000 a week. Such a decrease in the hospi-

tal's cash flow would jeopardize its ability to meet weekly payrolls and operating expenses, officials pointed out, because Mount Sinai's capital assets have been fully mortgaged to permit the plant expansion required to meet ever increasing community needs. The impending loss of a major part of the hospital's regular income, they said, would consequently necessitate the discontinuance of such vital, but money-losing, community services as Mount Sinai's medical training program and emergency room operation.

Upon finding that plaintiff had presented evidence sufficient to meet all the prerequisites for temporary relief, the court issued an order intended to preserve the status quo pending further consideration of the case. The order was subsequently extended by stipulation to permit formulation of the issues and decision on a motion to dismiss and on opposing motions for summary judgment to be prepared by the parties. Following the submission of these motions and oral argument thereon, the court further delayed initiation of the suspension with the acquiescence of the parties to permit preparation of this opinion.

Defendants argue in their motion to dismiss that the doctrines of sovereign immunity, ripeness, finality and exhaustion of administrative remedies, as well as the Medicare amendments themselves, prevent the court from hearing plaintiff's claims. We reject that conclusion and deny the motion to dismiss because under none of these theories was it ever intended that the courthouse doors be closed to a litigant in Mount Sinai's shoes confronted with irreparable injury from Government action and seeking only to prevent what Congress may never have authorized.

There being no genuine dispute as to any fact material to the issue of statutory authority, as the statements of the parties at oral argument and in their opposing motions for summary judgment

5. 20 C.F.R. §§ 405.370–405.373 (1973). The regulations became effective prior to the en-

actment of the Social Security Amendments of 1972. See note 6 infra.

reveal, we proceed to consider the question of statutory authority. The court independently arrives at the same conclusion expressed by Congress itself when it amended the Act to provide special authority and procedures to determine whether overutilization of Medicare services is occurring, to recover any payments improperly made for such services, and to safeguard the rights of hospitals and other providers of services in the process.[6]

These 1972 amendments were necessary because Congress, when it established the program, provided that if the Government once determined that hospital services were covered by Medicare and proceeded to pay for them, it could not return to the coverage question a second time years later and decide that the same services were not covered. The reason for such a limitation may be explained by the need to encourage hospitals to participate in Medicare despite the requirement that they agree not to charge their patients, but to bill the program for services it covers. By means of the prohibition against reopening coverage determinations, Congress insured that participating hospitals would be protected by prompt notification if the services they had provided were not covered, so that they could immediately proceed to collect from their patients.

Not until 1972 did Congress grant Medicare the authority to recover funds it had paid to a hospital under the circumstances of this case. Because the payments Medicare now seeks to recover were made between 1966 and 1972, at a time when Congress had not given Medicare the authority to recoup such payments, we hold that defendants are barred from implementing a suspension order against Mount Sinai for those years.

Under the authority granted by Congress in 1972, Medicare can now recover payments resulting from alleged overutilization of services. Consequently, the problem presented in this case will not hereafter arise.

## I

Defendants' motion to dismiss must be considered first because it goes to the heart of the court's power to resolve the questions of statutory authority and constitutionality raised by plaintiff's complaint. At the outset it is useful to delimit the precise issues presented by the motion: Whether the court has jurisdiction over this action and, if so, whether that authority should be exercised in this case. Not at issue are such factual problems as whether overutilization of Medicare services actually took place at Mount Sinai between 1966 and 1972, what the extent of the alleged abuses might have been, and whether overpayments to plaintiff resulted.

Plaintiff contends, as the complaint alleges, that the court's power to hear its claims is properly predicated on general federal question jurisdiction[7] and on Section 10 of the Administrative Procedure Act (APA).[8] Defendants respond that this action is barred by the Social Security Act itself and by the doctrines of sovereign immunity, ripeness, finality and exhaustion of administrative remedies. We will consider these theories seriatim.

### STATUTORY PRECLUSION

The limitation on judicial review contained in the original Social Security Act presents the initial impediment advanced by defendants to the court's assumption of federal question jurisdic-

---

6. Social Security Amendments of 1972, Pub. L.No. 92–603, § 249F, 86 Stat. 1329, amending 42 U.S.C. § 1301 et seq. (1970) (codified at 42 U.S.C. § 1320c (Supp. II, 1972)). The 1972 amendments apply only to payments made to providers after October 30, 1972, and therefore do not provide authority for recoupment of the payments made to Mount Sinai between July 1, 1966, and January 1, 1972, which are the basis for this dispute. Consequently, all citations herein will be to the Act as it read prior to the 1972 amendments, except as otherwise indicated.

7. 28 U.S.C. § 1331 (1970).

8. 5 U.S.C. § 701 (1970).

tion. Section 205(h) provides that subject only to the review afforded by the Act, the results of an administrative hearing are final and may not be relitigated in the courts under federal question or other independent jurisdictional provisions.[9] This limitation was incorporated by reference in Section 1872 of the Medicare amendments, and consequently governs any disputes arising under the program.[10] Because the Act authorizes judicial review pursuant to Section 205(g) for health care facilities in only two instances, neither of which includes the suspension of Medicare payments to a provider of services,[11] defendants assert that Section 205(h) expressly prohibits federal question jurisdiction.

The short answer to this argument is that Section 205(h) must be read in pari materia with Sections 205(b) and 205(g) which complete the statutory scheme for review of Medicare disputes.[12]

Section 205(g) conditions the limited judicial review it carefully details on the availability of an administrative hearing and the exercise of that right in accordance with Section 205(b).[13] Likewise, it is only "after a hearing" that Section 205(h) by its terms renders decisions of the Secretary binding and unreviewable by any route other than Section 205 (g).[14] Where a hearing is authorized, therefore, Section 205(h) serves to prevent the premature disruption of the administrative hearing procedure established by Section 205(b), and to insure that the limited scope of judicial review intended by Section 205(g) is not circumvented by the development de novo of a judicial record unguided by the hand of agency expertise.

It does not follow, however, that Section 205(h) likewise forbids judicial scrutiny where the Act makes no provision for a hearing that is subject to administrative and judicial review. In the

---

9. Section 205(h) provides:
 "The findings and decisions of the Secretary after a hearing shall be binding upon all individuals who were parties to such hearing. No findings of fact or decision of the Secretary shall be reviewed by any person, tribunal, or governmental agency except as herein provided. No action against the United States, the Secretary, or any officer or employee thereof shall be brought under section 41 of Title 28 to recover on any claim arising under this subchapter."
 42 U.S.C. § 405(h) (1970). The provision in Title 28 for federal question jurisdiction, 28 U.S.C. § 1331 (1970), was formerly contained in Section 41(1) of that title, and is therefore included within the prohibition of Section 205(h).

10. Section 1872 provides, in pertinent part:
 "The provisions of . . . subsections (a), (d), (e), (f), (h), (i), (j), (k), and (l) of section 405 of this title, shall also apply with respect to this [Medicare] subchapter to the same extent as they are applicable with respect to [social security disputes in] subchapter II of this chapter."
 42 U.S.C. § 1395ii (1970).

11. Section 1869(c) provides:
 "Any institution or agency dissatisfied with any determination by the Secretary that it is not a provider of services, or

with any determination described in section 1395cc(b)(2) of this title [terminating its status as a provider], shall be entitled to a hearing thereon by the Secretary (after reasonable notice and opportunity for hearing) to the same extent as is provided in section 405(b) of this title, and to judicial review of the Secretary's final decision after such hearing as is provided in section 405(g) of this title."
 42 U.S.C. § 1395ff(c) (1970).

12. 42 U.S.C. § 405(b, g) (1970). Both of these provisions apply to Medicare because they are incorporated by the terms of Section 1869(c) of the Act. 42 U.S.C. § 1395ff(c) (1970). See note 11 supra.

13. Section 205(g) provides in pertinent part:
 "Any individual, *after any final decision* of the Secretary made *after a hearing to which he was a party*, irrespective of the amount in controversy, may obtain a review of such decision by a civil action . . . . The Court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Secretary, *with or without remanding the cause for a rehearing.* The findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive . . . . . ."
 42 U.S.C. § 405(g) (1970) (emphasis added).

14. See note 9 supra.

absence of any administrative hearing and appeal procedure, there is no need to protect the integrity of the administrative process; and where no administrative record has been prepared, limiting the scope of judicial review fails to serve any paramount purpose.

More weighty are the constitutional considerations which caution against such a broad interpretation of Section 205(h). To suggest that Congress intended to foreclose even judicial review in every case for which it did not provide an administrative hearing is to impute to the legislature a cavalier disregard for the dictates of due process.[15] We therefore concur in the view that "[a]bsent any evidence to the contrary, Congress may rather be presumed to have intended that the courts should fulfill their traditional role of defining and maintaining the proper bounds of administrative discretion and safeguarding the rights of the individual." Cappadora v. Celebrezze, 356 F.2d 1, 6 (2d Cir. 1966).

The authority advanced by defendants for reading Section 205(h) as an absolute bar to jurisdiction under any circumstances is consequently unpersuasive. Only two of the four cases they cite so much as suggest that the provision's prohibition of judicial review extends to disputes for which no administrative hearing may be obtained.[16] One decision avoided consideration of the due process problems inherent in such a holding by ruling that nothing prevents actions like this one which are limited to questions of the constitutionality and statutory basis for Medicare determinations. Schroeder Nursing Care, Inc. v. Mutual of Omaha Ins. Co., 311 F.Supp. 405 (E.D.Wis.1970). The other likewise stopped considerably short of suggesting that due process would tolerate a complete denial of review to be implied in every case, deciding only that Congress may prohibit judicial consideration of de minimus beneficiary claims to benefits where its intention to do so has been plainly and expressly stated. Kuenstler v. Occidental Life Ins. Co., 292 F.Supp. 532 (C.D.Cal.1968).

Far from expressing such an intent, the legislative history of the Medicare amendments does little more than paraphrase the language incorporated from Section 205(h) which must be construed by the court. The report of the Senate Finance Committee states that "[i]t is intended that the remedies provided by [the Medicare] review procedures shall be exclusive." [17] Insofar as that observa-

15. Of course, a hearing may not be required in every case in which agency action affects a private interest. Conversely, however, it cannot be said with certainty that no hearing will be required in any such case. Whether due process mandates any procedural protection at all of an individual interest depends on whether that interest is within the contemplation of the liberty or property language of the Fifth Amendment, cf. Morrissey v. Brewer, 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972), citing Fuentes v. Shevin, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972), and on whether it is adversely affected by agency action to the extent that the individual will be "condemned to suffer grievous loss." Joint Anti-Fascist Refugee Comm. v. McGrath, 341 U.S. 123, 168, 71 S.Ct. 624, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring), quoted in Goldberg v. Kelly, 397 U.S. 254, 263, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970) and in Morrissey v. Brewer, 408 U.S. at 481. Only a case-by-case "determination of the precise nature of the government function involved as well as of the private interest that has been affected by governmental action" can then settle whether the process due is a hearing. Cafeteria & Restaurant Workers Union v. McElroy, 367 U.S. 886, 895, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230 (1961). Absent so much as a clear congressional expression of the necessity for committing an unlimited class of administrative determinations completely to agency discretion for summary adjudication, some cases such as this one may arise in which due process could be jeopardized if Congress had precluded any opportunity whatsoever for a hearing. See Kingsbrook Jewish Medical Center v. Richardson, 486 F.2d 663, 667 (2d Cir. 1973).

16. Sovereign immunity, not Section 205(h), defeated jurisdiction in the other two decisions. Johnson v. Johnson, 332 F.Supp. 510 (E.D.Pa.1971); Allen v. Allen, 291 F.Supp. 312 (S.D.Iowa 1968).

17. S.Rep.No. 404, 89th Cong., 1st Sess., pt. 1 (1965), in U.S.Code Cong. & Admin.News, p. 1995 (1965).

tion expresses congressional intent, it explains the Committee's purpose in amending House Bill 6675 to incorporate Section 205(h) by reference; namely, to insulate the Medicare appeal procedure just as review of social security determinations had always been insulated. The statement therefore assumes, rather than defines, the circumstances under which Section 205(h) is to be applied to preclude review. To interpret it as extending the prohibition of judicial scrutiny to cases for which no administrative hearing is available would be to ignore the rule that where agency action is challenged as a denial of due process, it is "immune from judicial review, if ever, only by the plainest manifestation of congressional intent to that effect." Gonzalez v. Freeman, 118 U.S.App.D.C. 180, 334 F.2d 570, 575 (1964) (Burger, J.).[18]

In the absence of more compelling authority, it is difficult to justify according unlimited scope to the Act's prohibition of federal question jurisdiction as a means to the end of barring judicial review. The court is convinced that Section 205(h) was intended to insure the orderly resolution of disputes through procedures the Act established, not to risk frustration of due process by foreclosing judicial consideration of determinations for which Congress provided no reviewable administrative hearing. We therefore join in the construction of the provision adopted by most courts which have considered the question:

"Where the Medicare Act establishes procedures for review of the Secretary's decision, a court may not re-view that decision by any other means. However, where the Act does not provide such procedures, section [2]05 (h) does not preclude review."

Aquavella v. Richardson, 437 F.2d 397, 402 (2d Cir. 1971), *quoted in* Kingsbrook Jewish Medical Center v. Richardson, 486 F.2d 663, 666–667 (2d Cir. 1973); *and* Temple University v. Associated Hosp. Serv., 361 F.Supp. 263, 269 (E.D.Pa.1973).[19]

So construed, the Act presents no bar to the adjudication of this case. Because the amount in controversy unquestionably exceeds $10,000, we hold that this action may be maintained on the basis of federal question jurisdiction. However, the question of whether plaintiff has stated a claim upon which relief can be granted remains to be considered.

## NONSTATUTORY REVIEW

The APA authorizes nonstatutory review of such challenges to administrative determinations as this one through "any applicable form of legal action, including actions for declaratory judgments or writs of prohibitory or mandatory injunction . . . in a court of competent jurisdiction.[20] Having held that Section 205(h) does not prohibit federal question jurisdiction, we need not enter the controversy over whether the APA itself vests power in the court to hear this action for declaratory and injunctive relief.[21] There can be no dispute, at least, that this is a court of "competent jurisdiction" because an independent basis for subject matter jurisdiction exists and personal

---

18. By comparison, the declaration of congressional intent held a bar to review in the *Kuenstler* case spoke directly to the applicability of the provision to the kind of dispute there involved. 292 F.Supp. at 537.

19. *See* Opelika Nursing Home, Inc. v. Richardson, 356 F.Supp. 1338 (M.D.Ala.1973); Coral Gables Convalescent Home, Inc. v. Richardson, 340 F.Supp. 646 (S.D.Fla.1972).

20. 5 U.S.C. § 703 (1970).

21. *See* Warner v. Cox, 487 F.2d 1301, 1305 n. 8 (5th Cir. 1974). For a less recent, but more extensive discussion of the conflict among the circuits on this issue, see Project, Federal Administrative Law Developments —1971, 1972 Duke L.J. 115, 227–33 [hereinafter cited as 1971 Duke Project].

jurisdiction over the defendants has been obtained.[22]

Review cannot be secured under the APA, however, "to the extent that—(1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law." [23] The latter exception presents no difficulty because defendants have not suggested that the challenged suspension determination is entrusted to agency discretion "to the extent that" the APA would not apply even if there were a clear abuse of authority or procedure. In any event, the exception is inapplicable because the dispute over whether the Act commits issuance of a suspension order exclusively to agency discretion cannot be resolved on the conflicting allegations of the pleadings. Nor did Congress intend the exception to prevent review under the APA except where a statute is "drawn in such broad terms that . . . there is no law to apply," which is not the case here. Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 410, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).

Defendants nonetheless contend that relief cannot be obtained under the APA because the Medicare amendments "preclude judicial review." Although we have held that review is not expressly prohibited by Section 205(h), they advance the alternative argument that it is foreclosed by the doctrine of implied preclusion. Relying on the provisions for review of Medicare determinations in Section 1869 of the Act, defendants submit that Congress, having carefully designated the types of disputes for which judicial review could be obtained, must have intended that no other controversies be reviewable.

We cannot accept such an argument, however, because Congress intended the APA to apply to a wide range of agency action absent "clear and convincing evidence" in a particular statute to the contrary.[24] This presumption of reviewability has resulted in the rule that judicial review "will not be cut off unless there is persuasive reason to believe that such was the purpose of Congress." Abbott Laboratories v. Gardner, 387 U.S. 136, 140, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681 (1967); Air Line Pilots Ass'n Int'l v. Department of Transportation, 446 F.2d 236, 241 (5th Cir. 1971). The court is not persuaded that the silence of the Medicare amendments on the availability of review for determinations other than those specified in Section 1869 can be considered either a clear or a convincing manifestation of congressional intent. Aquavella v. Richardson, 437 F.2d at 402. We therefore conclude that the APA applies to this action, and that plaintiff has stated a claim for which relief can be granted on the basis of nonstatutory review.

## SOVEREIGN IMMUNITY

Defendants argue that the APA, if it provides a presumption of reviewability, does not constitute a waiver of sovereign immunity. In 1961, however, the Fifth Circuit endorsed the contrary view that the APA "makes a clear waiver of sovereign immunity in actions to which it applies," and explained that "by providing judicial review in an action brought by 'any person adversely affected or aggrieved by any agency action' Congress permitted suits which under established tests would certainly be barred as suits against the government." Estrada v. Ahrens, 296 F.2d 690, 698 (5th Cir. 1961). Although the continuing vitality in this Circuit of the rule in *Estrada*

22. Byse & Fiocca, Section 1361 of the Mandamus and Venue Act of 1962: "Non statutory" Judicial Review of Federal Administrative Action, 81 Harv.L.Rev. 308, 327 (1967); 1971 Duke Project, *supra* note 21, at 230 & n. 18.

23. 5 U.S.C. § 701(a) (1970).

24. H.R.Rep.No.1980, 79th Cong., 2d Sess., 41 (1946), *quoted in* Abbott Laboratories v. Gardner, 387 U.S. 136, 140 n. 2, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967).

has been questioned,[25] it has yet to be explicitly overruled.[26]

Treating the APA as a waiver of sovereign immunity as in *Estrada* has many virtues. Not the least would be the simplicity and ease of application of the rule in our overburdened courts. Secondly, the prerequisites to review under the APA protect the very interests sovereign immunity serves. Not only is administrative action unreviewable under the APA where "statutes preclude judicial review" or agency action is "committed to agency discretion by law," but the doctrines of ripeness, finality and exhaustion insure that the public business entrusted to administrative agencies will not be unduly burdened. If an increase in judicial review results, it will fulfill a basic policy objective of administrative law by deterring administrative arbitrariness in a government which has become increasingly, if unavoidably, bureaucratic.[27]

Nonetheless, we cannot be unmindful of the limitations on *Estrada,* and of the five other circuits that have rejected the APA waiver theory.[28] Nor can we ignore the fact that since the enactment of the APA in 1946, the Supreme Court has warned that it may not "be deemed an implied waiver of all governmental immunity from suit," Blackmar v. Guerre, 342 U.S. 512, 516, 72 S.Ct. 410,

25. The Fourth Circuit has expressed the view that this circuit "apparently altered" the APA waiver rule in *Estrada* with its decision in Colson v. Hickel, 428 F.2d 1046 (5th Cir. 1970). Littell v. Morton, 445 F.2d 1207 (4th Cir. 1971); *see also* 1971 Duke Project, *supra* note 21, at 246 n. 67. *But see* Constructores Civiles de Centroamerica S.A. v. Hannah, 148 U.S.App.D.C. 159, 459 F.2d 1183, 1191 (1972), *citing* Estrada v. Ahrens, 296 F.2d at 698. However justifiable the inference drawn by the Fourth Circuit may be, it leaves unanswered the question of how the *Estrada* waiver rule was "altered"; namely, under what circumstances and to what extent, if any, the rule remains viable and controlling precedent applicable to a case like this one. A recent decision of this Circuit expressly declines to determine whether *Colson* marks a retreat from *Estrada,* holding only that "whatever waiver the APA provides does not extend so far as an action ex contractu for money." Warner v. Cox, 487 F.2d 1301 (5th Cir. 1974).

26. We are constrained to note that the Fifth Circuit's opinion in *Colson* nowhere adverts to the *Estrada* decision. Plaintiff Colson invoked Section 10 of the APA along with other jurisdictional statutes, 428 F.2d at 1050, but there is no direct evidence that he argued that it served as a waiver of sovereign immunity. *See* Colson v. Udall, 278 F. Supp. 826 (M.D.Fla.1968). Although the Fifth Circuit noted that it was "aware of the decision, and the dissenting opinion, in State of Washington v. Udall [9 Cir., 417 F.2d 1310]," in which the Ninth Circuit rejected the APA waiver theory, the court instead chose to base its ruling that sovereign immunity barred review of a decision of the Secretary of the Interior on two "prior decisions of this Court, relying upon decisions of the Supreme Court." 428 F.2d at 1050 & n. 1.

The Supreme Court rulings in which *Colson* placed its reliance concerned claims that governmental takings of private property constituted a denial of due process, despite the availability of an action for just compensation under the Tucker Act. Dugan v. Rank, 372 U.S. 609, 623–625, 83 S.Ct. 999, 10 L.Ed.2d 15 (1963); Malone v. Bowdoin, 369 U.S. 643, 647 & n. 8, 82 S.Ct. 980, 8 L. Ed.2d 168 (1962); Larson v. Domestic & Foreign Commerce Corp., 337 U.S. 682, 697 n. 18, 703 & n. 27, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949).

These decisions are far from irreconcilable with the view that the APA constitutes a waiver of sovereign immunity in actions to which it applies. *See* note 30 *infra.* The Fifth Circuit has since suggested one basis for such a distinction in a decision denying review under Section 10(c) of the APA, 5 U.S.C. § 704 (1970), on the theory that it exempts agency action from review for which the Tucker Act provides "some '. . . other adequate remedy in a court.'" Warner v. Cox, 487 F.2d 1301 (5th Cir. 1974).

27. For a discussion of the advantages and disadvantages of interpreting the APA as a waiver of sovereign immunity, see 1971 Duke Project, *supra* note 21, at 244–50.

28. Littell v. Morton, 445 F.2d 1207, 1213 (4th Cir. 1971); Washington v. Udall, 417 F.2d 1310, 1320 (9th Cir. 1969); Motah v. United States, 402 F.2d 1, 2 (10th Cir. 1968); Twin Cities Chippewa Tribal Council v. Minnesota Chippewa Tribe, 370 F.2d 529, 532 (8th Cir. 1967); Cyrus v. United States, 226 F.2d 416, 417 (1st Cir. 1955). *But see* Scanwell Laboratories, Inc. v. Shaf-

412, 96 L.Ed. 534 (1952),[29] and decided at least five cases in which sovereign immunity barred attempts to review administrative decisions.[30] Although the Court has since granted review in several cases under the APA without mention of sovereign immunity,[31] it has yet to articulate the operative distinguishing

fer, 137 U.S.App.D.C. 371, 424 F.2d 859, 873–874 (1970); Kletschka v. Driver, 411 F.2d 436, 445 (2d Cir. 1969).

We note that the APA did not apply to the decisions of the First, Eighth, and Tenth Circuits and therefore could not operate as a waiver of immunity, because the agency action therein was "committed to agency discretion by law." 5 U.S.C. § 701 (1970). The rulings of the Fourth and Ninth Circuits considered sovereign immunity only to discount its applicability.

29. Although this much quoted statement appears in the case in dictum, the Court expressly refrained from deciding whether, on the facts, the APA applied at all, much less as a waiver of sovereign immunity, where the Hatch Act arguably committed the challenged action to agency discretion. 342 U.S. at 514, 516.

30. Hawaii v. Gordon, 373 U.S. 57, 83 S.Ct. 1052, 10 L.Ed.2d 191 (1963); Fresno v. California, 372 U.S. 627, 83 S.Ct. 996, 10 L.Ed. 2d 28 (1963); Dugan v. Rank, 372 U.S. 609, 83 S.Ct. 999, 10 L.Ed.2d 15 (1963); Malone v. Bowdoin, 369 U.S. 643, 82 S.Ct. 980, 8 L. Ed.2d 168 (1962); Larson v. Domestic & Foreign Commerce Corp., 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949).

None of these decisions is fundamentally inconsistent with the view that the APA waives sovereign immunity in actions to which it applies. In Hawaii v. Gordon, for example, the APA could not have served as a waiver since it was inapplicable on the facts, if not because the state lacked standing, then because the agency action challenged was committed to the sovereign's discretion.

The remaining cases turned on the rejection, in the seminal Larson decision, of the argument that review of government takings of private property should be available under the traditional exception to the doctrine of sovereign immunity which permits suits against government officers to remedy unconstitutional agency action. Larson stands for the proposition, inter alia, that by guaranteeing due process to persons aggrieved by a governmental taking through an action for damages in the Court of Claims under the Tucker Act, Congress by law narrowed the officer suit exception, thereby broadening the scope of sovereign immunity and constitutionally permissible agency discretion. 337 U.S. at 697 & n. 18, 703 & n. 27.

The result of these cases would not be altered by holding that the APA constitutes a waiver of sovereign immunity in actions to which it applies, unless the teachings of Larson were ignored. It follows from the logic of Larson that the APA should not apply to suits to remedy government takings, since such takings have been "committed to agency discretion" by the Tucker Act. 5 U.S.C. § 701(a)(2) (1970). The APA would not be available, therefore, to serve as a waiver of sovereign immunity.

Similarly, the APA waiver approach need not conflict with the limitation in Larson on the exception to the doctrine of sovereign immunity which permits suits against government officers as a means of obtaining review of action by an agency that exceeds its statutory authority. The requirements articulated in Larson for successfully pleading this exception create what amounts to a presumption that if Congress gave an agency authority to do the sort of act complained of, it intended to authorize the specific action. See notes 31–33 infra and accompanying text. Sovereign immunity therefore forecloses judicial examination if a statute authorizes the act complained of or that general sort of action, but does not bar review if the act was prohibited by law.

The same result should follow from the APA waiver rule, because the APA will apply to permit review of such abuses of discretion as actions in excess of statutory authority only where the statute contains standards by which an abuse may be evaluated. Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. at 410. Unless, as Larson requires, a plaintiff can plead a statutory standard which forbids the action or sort of action he challenges, therefore, the APA will not apply to waive sovereign immunity and he will be unable to obtain review. Although there might be cases in which a statute would specify standards in authorizing the sort of action complained of, in which case the APA would apply as a waiver of sovereign immunity contrary to the dictates of Larson, judicial consideration would properly be focused not on whether there were statutory authority for the action, but on whether, assuming such authority, the agency had abused the discretion afforded by the particular statutory standards.

31. E. g., Citizens to Preserve Overton Park v. Volpe, supra; Barlow v. Collins, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970); Association of Data Processing Serv. Organizations, Inc. v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970); Abbott Laboratories v. Gardner, supra.

principle. We are therefore constrained to assume, without deciding, that *Estrada* does not control our decision here, and that the doctrine of sovereign immunity demands independent consideration.

■■ There can be no dispute that agents of the sovereign are named as defendants in this action. Kuenstler v. Occidental Life Ins. Co., 292 F.Supp. 532 (C.D.Cal.1968). But that fact does not determine whether a jurisdictional bar is necessarily interposed by the doctrine of sovereign immunity. The applicability of the doctrine "is to be determined, not by the fact of the party named as defendant on the record, but by the result of the judgment or decree which may be entered . . . ." Larson v. Domestic & Foreign Commerce Corp., 337 U.S. 682, 687 n. 6, 69 S.Ct. 1457, 1460, 93 L.Ed. 1628 (1949), quoting Minnesota v. Hitchcock, 185 U.S. 373, 387, 22 S.Ct. 650, 46 L.Ed. 954 (1902). Sovereign immunity governs "if, 'the judgment sought would expend itself on the public treasury or domain, or interfere with the public administration,' . . . or if the effect of the judgment would be 'to restrain the Government from acting, or to compel it to act.'" Dugan v. Rank, 372 U.S. 609, 620, 83 S.Ct. 999, 1006, 10 L.Ed.2d 15 (1963). The latter test is met by Mount Sinai's request that the court "permanently enjoin the defendants from withholding, suspending or reducing any current or future payments" on authority of the challenged suspension regulations, and we can only conclude that the doctrine of sovereign immunity applies.

■ Nonetheless, the courts have long indulged the legal fiction that when an agent of the sovereign acts ultra vires his statutory or constitutional authority, his actions are not those of the sovereign and equitable relief may be granted against him individually. Such "officer suits" are available in the case of "(1) action by officers beyond their statutory powers and (2) even though within the scope of their authority, the powers themselves or the manner in which they are exercised are constitutionally void." Dugan v. Rank, 372 U.S. at 621–622.

■ The officer suit exception for action in excess of statutory authority has been given limited scope, however, since the *Larson* decision. Prior to that ruling, if a plaintiff alleged this exception, courts would admit jurisdiction on the pleadings and proceed to a ruling on the merits unless the officer's actions could not be said to exceed the statutory authority pleaded by the government. The *Larson* case in effect shifted the burden from the government to the plaintiff by prohibiting consideration of the merits if the officer demonstrates, by way of a prima facie showing of "general 'authority' to do the *sort* of act complained of,"[32] that his actions "*do not conflict with* the terms of his valid statutory authority."[33] Moreover, it is no longer enough in the wake of *Larson* to invoke the exception by alleging simply that the actions of a government officer are "illegal" or "unauthorized." 337 U.S. at 693. Rather, the plaintiff must specifically "set out in his complaint the statutory limitation on which he relies." 337 U.S. at 690.

■■ Although the tests subsequently applied have varied from circuit to circuit,[34] the Fifth Circuit has found the allegations of the complaint determinative. An officer suit may be maintained

---

32. Comment, Immunity of Government Officers: Effects of the Larson Case, 8 Stan.L. Rev. 683, 689 (1956); *see* Project, Federal Administrative Law Developments—1969, 1970 Duke L.J. 67, 204.

33. 337 U.S. at 695 (emphasis added).

34. *See* 1971 Duke Project at 237 n. 27. The Ninth and Tenth Circuits, for example, have

adopted an administrative discretion analysis under which anything short of an express statutory grant of discretion covering the challenged action is sufficient to render it ultra vires, and thereby adequate to invoke the officer suit exception. *E. g.*, Washington v. Udall, 417 F.2d 1310 (9th Cir. 1969); National Helium Corp. v. Morton, 455 F.2d 650 (10th Cir. 1971).

if plaintiff's averments are "affirmative" and "explicit" rather than "insubstantial" or "frivolous," and if, assuming their truth for jurisdictional purposes, they demonstrate a "clear, legal duty" imposed by statute on a government officer. Carter v. Seamans, 411 F.2d 767, 770–771 (5th Cir. 1969), cert. denied 397 U.S. 941, 90 S.Ct. 953, 25 L. Ed.2d 121. Mount Sinai's substantial allegations meet this standard not only by affirmatively and explicitly denying that defendants' actions are authorized, but also by citing a provision imposing a contrary duty.[35]

It is impossible to make a prima facie determination of whether defendants are authorized to do "the sort of act complained of" by Section 1815 of the Act upon which defendants rely.[36] Confronted with plaintiff's reliance on a different provision, the court is unable to say whether defendants' actions do or "do not conflict with the terms of [their] valid statutory authority" without considering the merits. We therefore conclude that the complaint sufficiently invokes this officer suit exception to demand inquiry into the merits.

Sovereign immunity likewise will not defeat jurisdiction over plaintiff's constitutional challenge because it is one of the few due process claims to come within the second officer suit exception. Since *Larson*, the rule has been settled:

> "Where the action against which specific relief is sought is a taking, or holding, of the plaintiffs' property, the availability of a suit [e. g., in the Court of Claims] for compensation against the sovereign will defeat a contention that the action is unconstitutional as a violation of the Fifth Amendment."

337 U.S. at 697 n. 18. Unlike the plaintiff in *Larson*, however, Mount Sinai has no viable legal remedy by which it may obtain compensatory damages for the injury it stands to suffer from defendants' actions. No subsequent legal remedy can conceivably compensate the hospital or the public for the loss of trained personnel and community medical services that will result from implementation of the suspension order.[37]

Notwithstanding the availability of an officer suit, however, sovereign immunity may sometimes remain a jurisdictional bar because of the impact of the relief requested, in accordance with a celebrated footnote to the *Larson* decision:

> "Of course, a suit may fail, as one against the sovereign, even if it is claimed that the officer being sued has acted unconstitutionally or beyond his statutory powers, if the relief re-

---

35. Mount Sinai alleges, *inter alia*, that "the regulations under which Defendants purport to act . . . are being applied in a manner *not authorized by law*," and that the 1972 Medicare amendments, here inapplicable, "provide the only statutory basis for imposing a penalty on a retroactive basis against providers of services on the grounds that some of the services provided were not medically necessary." Plaintiff asserts that once payment for services rendered has been made, such attempts at retroactive recoupment are barred by the statutory limitation contained, by way of a condition precedent, in section 1862(a)(1) of the Act which, as the complaint specifically notes, "states that no payment may be made under the Medicare program for any expenses incurred for items or services 'which are not reasonable and necessary.'" 42 U.S.C. § 1395y(a)(1) (1970).

36. 42 U.S.C. § 1395g (1970).

37. The court is aware of no case. deciding whether a contract may be implied between a provider of services and the government from section 1866 of the Act, 42 U.S.C. § 1395cc (1970), so that Mount Sinai would have an action for compensatory damages in the Court of Claims. 28 U.S.C. § 1491 (1970). Even if such an action could be maintained, however, we think the remedy would necessarily be inadequate given the impossibility of ascertaining the full extent of the consequential damages occasioned by the suspension order. Moreover, the remedy contemplated by the Medicare regulations would provide reimbursement only for amounts that should not have been withheld, not for consequential losses resulting from the withholding of payments itself. 20 C.F. R. § 405.373(b) (1973).

quested cannot be granted by merely ordering the cessation of the conduct complained of but will require affirmative action by the sovereign or the disposition of unquestionably sovereign property."

337 U.S. at 691 n. 11. Nonetheless, Mount Sinai seeks no affirmative government action, but only an end to the suspension order. The fact that Medicare payments would then continue as usual requires no more of the government than the routine distribution of funds concededly due the hospital for services currently rendered, not the "disposition of unquestionably sovereign property."

The application of the *Larson* affirmative impact rule has subsequently been refined, moreover, to require the dismissal only of those actions in which the relief requested would "work an intolerable burden on governmental functions outweighing any consideration of private harm." Washington v. Udall, 417 F.2d 1310, 1318 (9th Cir. 1969); Littell v. Morton, 445 F.2d 1207, 1213 (4th Cir. 1971).[38] Whatever the extent to which the relief Mount Sinai requests might be characterized as affirmative in nature, we conclude on balance that sovereign immunity should not bar this action because it is the burden on the plaintiff and the public, not that on the government, which is an intolerable one.

Nor would the requested relief thwart efforts by Medicare to prevent ongoing overutilization and to recoup any resulting overpayments from Mount Sinai or other providers of services. The Act now expressly provides procedures holding providers accountable for any medically unnecessary services charged to the program after October 30, 1972.[39]

The one serious burden on the government if relief were granted would be frustration of the present attempt to recover alleged overpayments made prior to 1972. That effort, however, can serve only one purpose: To protect the economic viability of the program. Yet defendants do not suggest that Medicare has been placed in any financial jeopardy as a result of the suspected overpayments, or that failure to recoup them will endanger the continued operation of the program. To the contrary, however costly to the trust fund the relief requested may seem, the Medicare program has survived without visible impairment in the years since the alleged overpayments were made. It therefore appears that the burden on governmental functions has been tolerable, and would hardly become otherwise if relief were granted.

By comparison, the "private" harm to be considered here poses a twofold threat of substantial public injury. First, although the consequences of denying review to Mount Sinai will have no little impact on the hospital's financial condition, the interest of the public it serves will sustain a still greater injury. If the challenged suspension order were held immune from judicial review, the public health and welfare would stand to suffer irrevocable harm from whatever cutbacks in money-losing community services become necessary as a result of the reduction of the hospital's income.

Secondly, there is a broader public interest that would be injured by holding that sovereign immunity bars such a limited action as this one. It has never been thought that even unconstitutional or unauthorized actions by agents of the sovereign should be immunized from judicial review simply because the remedy requested might conceivably have an affirmative impact on agency action, no matter how remote it might be. If that were true, the precaution might often prove more deleterious to the public interest than the cost of the cure. Where,

---

38. *See* L. Jaffe, Judicial Control of Administrative Action 226–27 (1965) [hereinafter cited as Jaffe]; 3 K. Davis, Administrative Law Treatise § 27.05, at 571–76 (1958) [hereinafter cited as Davis]; *cf.* Larson v. Domestic & Foreign Commerce Corp., 337 U.S. at 704.

39. *See* note 6 *supra* and accompanying text.

as here, the operation of a government program will not be adversely affected, the public interest in insuring lawful agency action should ordinarily prevail. We therefore conclude that the potential injury to the public outweighs any burden on governmental functions which might be imposed if the relief Mount Sinai seeks were granted.

 The same balancing of interests supports an alternative theory. There is authority for the proposition that even where an officer suit may be unavailable, sovereign immunity will not defeat an action, which, on balance, does not constitute a "substantial bothersome interference with the operation of government." Littell v. Morton, 445 F.2d at 1214. Either approach supports our holding that the doctrine of sovereign immunity is not so transcending as to require dismissal of this action.

## II

Defendants next contend that if neither the Medicare amendments nor the doctrine of sovereign immunity defeats the court's jurisdiction, its exercise must be declined because this action is not ripe, the agency determination challenged is not final, and plaintiff has failed to exhaust its administrative remedies.[40] Although some judicial discussion suggests that these issues have become so interrelated as to mandate a broad balancing of interests,[41] the result

has been criticized for occasionally losing sight of important considerations.[42] In the interest of articulating the pertinent factors, we will examine each issue separately.

## RIPENESS

Ripeness, a judicial construct formulated to prevent the depletion of judicial resources through premature judicial action, has traditionally been thought to have as its focus the crystallization of the legal controversy between the litigants, as opposed to the concern expressed by the doctrine of finality for the integrity of the administrative process.[43] Although the issue of ripeness ordinarily does not arise in the context of adjudicatory proceedings, the interests embodied in the doctrine are always relevant considerations in determining whether to grant nonstatutory review.

 In *Abbott Laboratories*, the leading case on the application of the ripeness doctrine, the Supreme Court articulated the elements to be examined in deciding whether the issues are fit for judicial decision.[44] The Court considered such factors as whether the issues were predominantly legal rather than factual, whether the impact of the agency action was suffficiently direct and immediate to create a real case or controversy, and whether intervention at a later stage of the agency process might

---

40. Defendants do not suggest, nor could they, that plaintiff lacks standing or that the suspension order is informal action not susceptible to review.

41. In Aquavella v. Richardson, for example, the Second Circuit commented:
 "Courts have employed the elusive concept of finality, as well as the related and often overlapping doctrines of ripeness and exhaustion of administrative remedies, to determine whether or when they should inject themselves into the administrative process. While each doctrine has its own nuances, common to all is a careful balancing of the need for effective judicial protection against the need for efficient and responsible administrative action. . . ."
 437 F.2d at 403.

42. 1971 Duke Project, *supra* note 21, at 286-87.

43. 1971 Duke Project, *supra* note 21, at 278 & n. 14; *cf.* Jaffe, *supra* note 38, at 395.

44. Although the Court advanced a two step test for ripeness which requires evaluation not only of "the fitness of the issues for judicial decision," but also of "the hardship to the parties of withholding court consideration," 387 U.S. at 149, examination of the latter step will be deferred in the interest of clarity. *See* note 60 *infra* and accompanying text.

not better serve the interests of judicial economy without causing further serious and unnecessary harm to the petitioner. We therefore turn to an examination of these elements.

■ The complaint restricts itself to challenging the statutory authority for the suspension order and the constitutional adequacy of the procedures which led to its issuance. Both issues have long been considered purely "legal" questions to be entrusted to the judiciary rather than to executive agencies for resolution.[45] As their opposing motions for summary judgment indicate, neither side argues that disputed issues of fact remain that require further administrative consideration prior to judicial resolution of the issues.[46]

Secondly, the record as it now stands is adequate for the limited review requested, and delay of judicial intervention pending further administrative proceedings would produce no substantial clarification of the issues. The necessary factual foundation for determining the statutory authority question is to be found in the statute itself and its legislative history, rather than in any factual record the agency might prepare.[47] In addition, the constitutional issue is clearly drawn, and the pertinent facts are supplied by the regulations under which the suspension order was issued.

Thirdly, the impact of the suspension order on the hospital is sufficiently direct and immediate to insure that judicial review at this stage will produce more than an advisory ruling on hypothetical questions. The withholding of Medicare payments due the hospital for services rendered is not simply a distant threat or possibility. Whereas, judicial intervention might have been premature if plaintiff had brought suit when first notified that the agency was considering such action, or if the suspension had been subject to further administrative review prior to implementation, it is timely now. The suspension will take effect immediately unless judicial review is granted at this point in the agency proceedings.

A more direct and immediate impact could hardly be imagined than the substantial effect which a 15 percent cutback in Medicare payments will have on Mount Sinai's cash flow position. The suspension will certainly work "an immediate and significant change" in the hospital's conduct of its affairs. Abbott Laboratories v. Gardner, 387 U.S. at 153. Nor does Mount Sinai have any realistic means at its disposal by which it might avoid the impact of the cutback in payments. Its assets are fully mortgaged as uncontradicted testimony revealed, and projected donations are budgeted. To bill patients who received the disputed services, if it were possible, would not promptly ameliorate the problem,[48] and to increase charges for

45. *E. g.* Abbott Laboratories v. Gardner, 387 U.S. at 149 n. 16; Aquavella v. Richardson, 437 F.2d at 404.

46. Only the question of whether, as applied, the challenged regulations constitute a denial of due process may present factual issues if it is reached. Defendants do not suggest, however, that those factual issues should first be determined in administrative proceedings.

47. To the extent that the agency's experience may be relevant, opportunities have been available for its communication to the court in argument or written brief, although defendants have not pointed out to the court any particular factual justification for the regulation.

48. Statistical projections were made for the years 1966 to 1972 on the basis of a study of the charges submitted by Mount Sinai for a sample group of patients treated in 1970 whose medical charts were examined. Whether or not Mount Sinai assented to this procedure, which is a matter of dispute, there can be no question that as a result of the use of this method, the hospital has no basis upon which to bill any but the 710 individual patients studied for specific services not covered by Medicare. Moreover, absent a determination that particular charges to a patient are not covered, Mount Sinai would risk termination from the Medicare program, to the detriment of the many beneficiaries who use the hospital, if it were to attempt to charge its patients during those years for such services. 42 U.S.C. § 1395cc(a)(1)(A) (1970); 20 C.F.R. §§ 405.607(a), 405.614(a)(1) (1973).

non-Medicare patients to offset the losses would be as unconscionable as it would be unfeasible.[49]

Finally, considerations of judicial economy do not counsel delay in determining the questions presented until a later stage of the administrative process. The issues of statutory authority and constitutionality that have been raised are fundamental to the agency's license to proceed, yet the regulations contemplate no hearing on these questions, but only refinement of the overpayment determination which led to the challenged suspension order.[50] There appears little likelihood, therefore, that the issues presented will be mooted by further administrative consideration. It would be a false economy, indeed, that thought to conserve judicial resources at the expense of continued unlawful government action.

The issues therefore appear fit for judicial determination and the controversy ripe for decision. We will postpone final resolution of the question, however, to permit an examination of finality, which was considered by the Supreme Court as an element of ripeness in *Abbott Laboratories*.

## FINALITY

Defendants contend that their determination to suspend Medicare payments is not "final agency action" within the meaning of the APA, but should rather be characterized as "preliminary" only.[51] The regulation under which the agency has proceeded states that payments to providers of services may be suspended in whole or part when there is "reliable evidence" that an overpayment has been made.[52] A separate regulation provides that the suspension may be rescinded or adjusted as the result of subsequent agency review.[53] Nonethe-

---

49. Since the great majority of Mount Sinai's patients are Medicare beneficiaries, *see* note 1 *supra*, charges for non-Medicare patients would have to be increased considerably in excess of 15 percent in order to make up the loss of income resulting from implementation of the suspension order. Mount Sinai lacks the option of increasing its charges to Medicare patients because it would risk termination if it did not bill such services to the program, *see* note 47 *supra*, and because it then becomes entitled to receive only the "reasonable cost" of the services rendered. 42 U.S.C. § 1395f(b) (Supp. II, 1972). "Reasonable cost" is defined as the lesser of the "cost actually incurred," 42 U.S.C. § 1395x(v)(1) (Supp. II, 1972), or the "customary charges with respect to such services," 42 U.S.C. § 1395f(b) (Supp. II, 1972), and payment therefore would be withheld in the face of sudden increases in hospital charges. *See generally* 20 C.F.R. §§ 405.401–405.488 (1973).

50. 20 C.F.R. § 405.373(b) (1973).

51. Section 10(c) of the APA provides in part:

"Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review. A *preliminary*, procedural, or intermediate agency action or ruling not directly reviewable is subject

to review on the review of the final agency action.
5 U.S.C. § 704 (1970) (emphasis added).

52. 20 C.F.R. § 405.370(a)(2) (1973) provides in part:
"(a) Payments otherwise authorized to be made to providers of services . . . may be suspended, in whole or in part, by an intermediary or a carrier when:
 * * *
"(2) The intermediary or carrier has reliable evidence, although additional evidence may be needed for a determination, that such overpayment exists or that the payments to be made may not be correct."

53. 20 C.F.R. § 405.373(b) (1973) provides:
"Where the suspension is put into effect by reason of § 405.370(a)(2), the intermediary or .carrier will take timely action after such suspension to obtain such additional evidence it may need to make a determination as to whether an overpayment exists or the payments may be made (i. e., evidence from the records of the provider or supplier of services). All reasonable efforts will be made by the intermediary or carrier to expedite such determinations. As soon as such determination is made, the provider or other supplier will be informed and, where appropriate, such suspension will be rescinded or adjusted to take into account such determination. If

less, we conclude for the reasons which follow that a suspension of Medicare payments based only on reliable evidence must itself be characterized under the APA as final agency action.

 In accord with the presumption of reviewability mandated by the APA, "[t]he cases dealing with judicial review of administrative actions have interpreted the 'finality' element in a pragmatic way." Abbott Laboratories v. Gardner, 387 U.S. at 149. In keeping with this functional approach, an agency order need not be the very last administrative ruling in order to be deemed a "final" one. Isbrandtsen Co. v. United States, 93 U.S.App.D.C. 293, 211 F.2d 51, cert. denied sub nom. Japan-Atlantic & Gulf Conf. v. United States, 347 U.S. 990, 74 S.Ct. 852, 98 L.Ed. 1124 (1954). Moreover, it is not the label affixed to its action by an agency that is determinative of finality, but a realistic appraisal of the consequences of exercising jurisdiction to permit appeal. Isbrandtsen Co. v. United States, 211 F.2d at 55. Such an appraisal, however, must not lose sight of a twofold concern for the proper judicial-administrative separation of power and the integrity of agency processes.[54] It is to a consideration of these two factors that we now turn.

Concern for the Constitutional separation of powers between the judiciary and the executive agencies bridges the conceptual morass between ripeness and finality. Many of the relevant factors, such as the adequacy of the record, the clarity of the issues, and the potential for judicial resolution of the controversy, relate primarily to ripeness, or fitness for judicial determination, and need not be reviewed here. Two additional considerations come into focus, however, in conjunction with an examination of

finality: The need for uniformity of decision and for the development of agency expertise.

When Congress perceives a need for prompt nationwide uniformity of decision, it may commit to an agency adjudicatory functions it might otherwise entrust to the courts. Yet this congressional concern that substantive regulatory principles receive equal nationwide application does not extend to the questions presented here of statutory authority and the constitutionality of agency action, which the founding fathers entrusted to judicial resolution. We therefore need not consider it further.

Courts must also be concerned that by exercising jurisdiction they will not unduly interfere with an agency's acquisition of administrative expertise pursuant to its congressional mandate. Particular solicitude is appropriate where an agency is first embarking upon a new field of regulation or administration of a novel program.

The substantive factual issues that confront Medicare in its investigation of overutilization, and about which expertise might arguably need to be developed, concern the medical necessity for providing specific treatment in a given case and the reasonable cost of services properly rendered. Yet, defendants have been required to develop reasonable cost expertise since the Medicare program's inception in 1966. If a question of the reasonableness of the costs charged by Mount Sinai were involved in this case, which it is not, defendants would therefore have had adequate opportunity to acquire the necessary expertise in the subject. Similarly, neither an opportunity nor a need exists for the development of agency expertise to evaluate the medical necessity of the treat-

such suspension is not rescinded, it shall remain in effect . . . . "
The language of this section, unlike that of the remainder of the suspension regulations, is largely precatory rather than mandatory. Although it states that certain actions "will" follow a suspension based merely on reliable

evidence, the only mandatory requirement is that the suspension "shall" remain in effect if it is not rescinded.

54. 1971 Duke Project, *supra* note 21, at 278–79 n. 14.

ment provided.[55] In accord with the apparent intent of Congress, medical determinations were left in this case to a peer review group of physicians.[56] Moreover, although overutilization is a problem which Medicare may again confront in the future, the 1972 amendments provide for its resolution without the development of a special body of agency expertise.[57]

Neither the need for uniformity of decision nor for the development of agency expertise consequently cautions against judicial intervention at this stage of the administrative process in view of the limited, but fundamental issues that have been raised. Not only from the previously examined standpoint of the judiciary, therefore, but also from that of the executive agencies, the proper allocation of authority between their respective branches does not militate against a determination that the disputed agency action is final.

▆▆ Whether holding that the suspension order meets the test for finality would unduly disrupt the integrity of agency processes remains to be considered. The factors which control are "whether the process of administrative decisionmaking has reached a stage where judicial review will not disrupt the orderly process of adjudication and whether rights or obligations have been determined or legal consequences will flow from the agency action." Port of Boston Marine Terminal Ass'n v. Rederiaktiebolaget Trans-Atlantic, 400 U.S. 62, 71, 91 S.Ct. 203, 27 L.Ed.2d 203 (1970).

Courts ordinarily hesitate to disrupt the orderly process of adjudication by intervening in the absence of a final agency decision for two major reasons, each of which subsumes a number of corollary considerations. The first is the need to give wide scope to agency discretion and expertise; the second, the desirability of encouraging the efficient and effective functioning of the administrative process. To the extent that these factors do not pertain to the issues presented, of course, the disruptive effect of the judicial exercise of jurisdiction is correspondingly minimized.

Having created an agency for the purpose of implementing a statutory scheme, Congress must be understood to intend that a factual record be developed and the statute applied in the first instance by the body to which it entrusted the necessary discretion and expertise. Ordinarily, therefore, the agency should be given the first chance to develop the record, exercise its discretion and apply the sum of its experience.

However, the role of agency discretion and expertise, like the need for development of a factual record, diminishes when the issues raised are those of statutory authority and the constitutionality of agency action. The question presented in this case of how much fifth amendment process may be due has been confided by the Constitution to the discretion and expertise of the judiciary, rather than to the agencies of the executive branch. Likewise, the judiciary is the ultimate arbiter of challenges such as this one to the statutory authority for agency action. Although an administrative agency's construction of its governing statute may be entitled to great weight, only the courts may finally decide the limits of its statutory authority.[58] Where, as here, only issues

---

55. Section 1801 of the Act, for example, contains a specific prohibition of governmental interference in the practice of medicine, the manner in which medical services are provided, and the selection, tenure or compensation of any officer or employee of any institution providing health services to the program. 42 U.S.C. § 1395 (1970).

56. Suspension Order of May 10, 1973, at 4–5.

57. *See* note 6 *supra* and notes 133–40 *infra* and accompanying text.

58. *E. g.*, Social Security Bd. v. Nierotko, 327 U.S. 358, 368–369, 66 S.Ct. 637, 90 L.Ed. 718 (1946); Stark v. Wickard, 321 U.S. 288, 310, 64 S.Ct. 559, 88 L.Ed. 733 (1944); *see* Abbott Laboratories v. Gardner, 387 U.S. at 149. The agency can, in addition, urge its interpretation of the statute upon the court, as it has done here.

of statutory authority and constitutionality have been raised, there is no compelling reason to give wide scope to agency discretion and experience.

Before intervening in the administrative process, the courts must also consider society's need to leave administrative agencies free to pursue their congressional mandate in the public interest without continual interruption from individual grievances. Thus, with an eye to agency efficiency and effectiveness, courts normally find it wiser to permit the administrative process and the public business to go forward than to encourage attempts to frustrate agency procedures by offering shelter in the courts at intermediate stages.

■ Nonetheless, it has been recognized that judicial intervention may be justified at an earlier stage in the administrative process than usual where, as here, there is a substantial showing that an agency has exceeded the authority granted it by Congress, or that it is acting unconstitutionally.[59] The simple reason for this exception is that both the public business and the public interest are advanced by resolving such issues promptly. Although disruption of the administrative process cannot be avoided, the public business stands to benefit from early notice of fundamental defects which would invalidate lengthy agency proceedings upon ultimate review. The public interest is likewise served by timely judicial supervision to insure that administrative action is lawful. Not even considerations of agency efficiency and efficacy, therefore, counsel against the limited review plaintiff seeks in this case.

## INJURY

■ The ultimate question courts must answer in determining finality is whether the extent and character of the injury suffered is sufficient under the circumstances of the case to justify disruption of the agency process. The Supreme Court has articulated the test as "whether rights or obligations have been determined or legal consequences will flow from the agency action." Port of Boston Marine Terminal Ass'n v. Rederiaktiebolaget Trans-Atlantic, 400 U.S. at 71.

Substantially the same question, although with different emphasis, requires consideration in determining ripeness under the two-step test enunciated in *Abbott Laboratories*.[60] It is not enough that the injury occasioned by agency action is sufficiently direct and immediate to insure that a real, justiciable controversy exists. Courts must "assess the hardship to the parties if judicial relief is denied" by inquiring whether "irremediable adverse consequences flow from requiring a later challenge." Toilet Goods Ass'n v. Gardner, 387 U.S. 158, 162, 164, 87 S.Ct. 1520, 1523, 1525, 18 L.Ed.2d 697 (1967).

Both the finality and ripeness injury tests are cut from the same cloth, the jurisprudence of equitable remedies.[61]

59. *See, e. g.*, Oestereich v. Selective Serv. Bd., 393 U.S. 233, 89 S.Ct. 414, 21 L.Ed.2d 402 (1968) ; Leedom v. Kyne, 358 U.S. 184, 188, 79 S.Ct. 180, 3 L.Ed.2d 210 (1958) ; Coca-Cola Co. v. FTC, 475 F.2d 299, 303 (5th Cir. 1973) ; Templeton v. Dixie Color Printing Co., 444 F.2d 1064, 1068–1069 (5th Cir. 1971) ; Boire v. Miami Herald Publishing Co., 343 F.2d 17, 20–21 (5th Cir. 1965) ; Fay v. Douds, 172 F.2d 720 (2d Cir. 1949) ; *cf.* Public Util. Comm'n v. United States, 355 U.S. 534, 539–540, 78 S.Ct. 446, 2 L.Ed.2d 470 (1958). Although the Fifth Circuit may have construed the precedent narrowly, it has assented to more than a cursory inspection of such challenges:

"When . . . parties bring suit in District Court alleging the deprivation of specific constitutional rights or, indeed, specific statutory rights, . . . the District Court has jurisdiction to inquire into the preliminary question of whether judicial vindication of the alleged rights is appropriate in a given procedural setting, and if so, whether such rights have been infringed and how they ought to be redressed."

Coca-Cola Co. v. FTC, 475 F.2d at 303 (citations omitted).

60. *See* note 44 *supra*.

61. *See* Abbott Laboratories v. Gardner, 387 U.S. at 148 ; Jaffe, *supra* note 38, at 410–411.

Yet by focusing on the extent of the harm to the plaintiff, or the timing of the request for judicial intervention, the judicial shorthand of each obscures the balancing of interests which has always been the touchstone for the exercise of judicial discretion in granting equitable relief.

What courts must and do consider does not stop with the question of the character and extent of the individual injury occasioned by agency action. The adverse effect on the agency and the judiciary of granting review must also be weighed, as well as whether the public interest argues for or against judicial intervention. Consequently, no hard and fast rule can define either finality or ripeness in terms of the injury to the aggrieved party. Any attempt to formulate such an objective standard simply expresses a conclusion about the appropriate balance in a particular case.

However characterized, the injury confronting Mount Sinai if review were denied at this stage of the suspension proceedings would be serious enough to foreclose a legal right. If the disputed services provided by the hospital are finally determined not to be covered by Medicare, Mount Sinai would acquire the right to collect for them from its former patients.[62] However, the fact that the contested suspension order by its own terms represents no more than a tentative determination of non-coverage operates to defeat the hospital's right. Daily prejudice to Mount Sinai's ability to collect from its patients is occasioned by delay in the final determination, given the advanced age and declining health of the program's beneficiaries. Because the suspension order thereby works to foreclose the hospital's right to collect for services rendered as long as six years ago, it finally "determines a legal right."

Moreover, even if that right were not effectively foreclosed, its exercise could do little to moderate the immediate financial injury Mount Sinai will incur in the absence of judicial intervention. The loss of as much as $100,000 a week from the 15 percent cutback in Medicare payments contemplated by the suspension order will have a severe impact on Mount Sinai's cash flow position, requiring reductions in its staff and in the community services it now performs.

To be sure, there is some authority for ending our inquiry at this point in reliance on the rule that "a threat of economic injury has always been regarded as sufficient . . . for the purpose of finding an order final and reviewable." Environmental Defense Fund v. Ruckelshaus, 142 U.S.App.D.C. 74, 439 F.2d 584 (1972). Like all other injury tests, however, this precept expresses no more than a conclusion about the appropriate balance among the competing factors in a particular case. Claims of financial hardship constitute only one sympton of injury, and a difficult one to evaluate at that. According them priority in judicial analysis creates the misimpression that prompt judicial review of agency action may be obtained only by a fortunate few with much to lose. The extent to which such a financial injury test may serve to denote the result in this or other cases equally depends on how much any adverse effect on the public interest, the judiciary, and the agency, weighs against granting review.

Whether affording judicial review to Mount Sinai at this stage of the suspension process would do a disservice to the public interest is a debatable issue. Suspension procedures, which Congress ordinarily authorizes expressly, are designed to provide an administrative procedure for protecting the public health, safety and welfare in emergency situations. Orders issued in accordance with such authority have consequently received a great measure of judicial deference, particularly where the individual injury they occasion is no more than a

---

62. 42 U.S.C. § 1395cc(a)(2) (1970). See notes 121–22 *infra*.

private economic interest in business profits.[63]

By comparison, not only does the suspension procedure Mount Sinai challenges lack express congressional authorization, but it protects a financial interest that operates to defeat, rather than promote, the public health and welfare. Although the importance of preserving the economic viability of the Medicare program cannot be denigrated, it must compete in this case with the harm to the public health and welfare that would follow from the hospital's reduction or discontinuance of vital public services as a result of the suspension order.

Moreover, the potential jeopardy to the economic viability of the Medicare program would be slight if implementation of the suspension order were delayed by judicial review. If defendants were ultimately to prevail in the action, the postponement of their ability to collect any overpayments finally determined to exist would not itself jeopardize the recovery of those sums.[64] The Medicare amendments provide extraordinary remedies for recouping payments made for non-covered services from individual beneficiaries and their relatives should attempts to recover from the hospital prove unsuccessful.[65] Under these circumstances, we think that the public interest in health and safety served by Mount Sinai outweighs the public interest in immediately restoring alleged overpayments to the Medicare program.[66]

Whether the injury Mount Sinai stands to suffer in the absence of judicial review outweighs the concerns represented by the concepts of finality and ripeness remains to be considered. Of course, it is not the individual injury to the hospital, strictly speaking, that is determinative. Rather, the individual attempt to invoke judicial review must be weighed as an expression of the public interest in obtaining access to the courts to secure relief from allegedly unlawful agency action.

As the court's discussion of the considerations underlying the doctrine of finality concluded, the integrity of the administrative process would not be seriously jeopardized if the limited review requested were granted. We think the modest disruption necessary would be more than outweighed by the harm from the "legal consequences [which] will flow" from denying review, and accordingly hold that the suspension determination is a final order within the meaning of the APA.

Likewise, any potential impediment to the fitness of the issues for judicial resolution is removed by the narrow scope of review sought by Mount Sinai. The concerns articulated in the foregoing discussion of ripeness, moreover, are vastly overshadowed by the "irremediable adverse consequences" of the injury both to the public and the hospital which

---

63. See, e. g., Nor-Am Agricultural Prod., Inc. v. Hardin, 435 F.2d 1151 (7th Cir. 1970) (en banc).

64. Defendants do not argue that Mount Sinai's financial future is so uncertain that delay in implementing the suspension would seriously compromise their ability to recoup the alleged overpayments if they should prevail, or that some form of security would not adequately serve to protect Medicare's interest in the interim. To the contrary, the testimony of record reflects that Mount Sinai possesses assets in the neighborhood of $97 million, and there is no indication that it could not readily survive foreseeable contingencies less drastic than the impending 15 percent suspension of its income from

services previously performed. This is consequently a much different case from that which would be presented if Medicare sought to recover funds from a small, privately owned nursing home with meager assets, where delay might well defeat any future recovery, thereby compelling the conclusion that no "court would interfere at [the initial suspension] stage if there were regulations providing a reasonably prompt administrative review of the preliminary action." Aquavella v. Richardson, 437 F.2d at 404.

65. 42 U.S.C. § 1395gg (1970).

66. See Aquavella v. Richardson, 437 F.2d at 402 n. 15; cf. Environmental Defense Fund v. Ruckelshaus, 439 F.2d at 592.

implementation of the suspension order will produce. We consequently hold that this controversy is ripe for judicial resolution.

To say this much, however, is not to imply that any agency action that is involved in a ripe controversy is necessarily final.[67] Although finality and ripeness share a common concern for the injury occasioned by agency action, the countervailing factors differ. Ripeness balances the injury suffered against the fitness of the issues for judicial consideration. Finality weights the injury against the harm to the integrity of the administrative process that would result from judicial intervention. There is no guarantee, therefore, that the same result will emerge from balancing both of these factors, although that happened to be the case here.

Having held that the challenged suspension order constitutes final agency action and that plaintiff's claims are ripe for judicial review, we need consider only one last obstacle to the exercise of jurisdiction. Defendants contend that this action must be dismissed, if for no other reason, because plaintiff has not exhausted its administrative remedies.

## EXHAUSTION

 The doctrine that administrative remedies must be exhausted prior to judicial review of agency action is a well established principle of judicial administration. Myers v. Bethlehem Shipbuilding Corp., 303 U.S. 41, 50–51, 58 S.Ct. 459, 82 L.Ed. 638 (1938). The general rule, formulated early in this century, is that failure to appeal an agency decision within the administrative process precludes judicial review. United States v. Sing Tuck, 194 U.S. 161, 24 S.Ct. 621, 48 L.Ed. 917 (1904). Interpreted as an expression of executive and administrative autonomy,[68] and as a matter of comity,[69] the principle applies not only where the governing statute makes administrative appeal procedures exclusive, but also where the requirement of exclusivity is not so explicitly mandated. McKart v. United States, 395 U.S. 185, 193, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969).

Although care must be exercised to distinguish the different situations in which it applies and the factors which require consideration in each, the exhaustion doctrine has long been held a bar to judicial review of interlocutory agency decisions while the administrative process continues.[70] Defendants accordingly invoke the doctrine here as an alternative to finality, arguing that if the suspension order constitutes final agency action, judicial review cannot be granted until Mount Sinai exhausts the remaining procedures provided by the suspension regulations for administrative review of the order.

Although it may be an oversimplification to say that problems of exhaustion begin where questions of finality end under the APA, the factors to be weighed by the courts are substantially identical in review of an interlocutory agency decision.[71] The difference is

---

67. In view of the prevailing judicial shorthand it is not surprising that at least one commentator has reached this conclusion. 1971 Duke Project, *supra* note 21, at 286–87.

68. Jaffe, *supra* note 38, at 425.

69. 1971 Duke Project, *supra* note 21, at 293; *see* Comment, Exhaustion of Administrative Remedies, 39 Cornell L.Q. 273, 292–93 (1954).

70. *See generally* Davis, *supra* note 38, § 20.-05. It is only in a loose sense that exhaustion creates, as defendants contend, a jurisdictional bar to judicial action. Jurisdiction properly refers to the power of the court to act, whereas exhaustion concerns the appropriate timing of its action, a matter subject to the sound discretion of the court once it has the power to act at all. Bannercraft Clothing Co. v. Renegotiation Board, 151 U.S.App.D.C. 174, 466 F.2d 345, 354 (1972); Smith v. United States, 199 F.2d 377, 381 (1st Cir. 1952); *see* Jaffe, *supra* note 38, at 425.

71. *See* Jaffe, *supra* note 38, at 425. Where an administrative action lacks finality, of course, the question of exhaustion need not be reached.

that where Congress has mandated an administrative appeal procedure or expressly authorized its creation, courts are properly more reluctant to intervene than if confronted with final action for which an agency appeal has not been provided. Administrative appeal provides an added opportunity for plaintiff's claims to be vindicated, thereby mooting the controversy and conserving judicial effort. Moreover, the appellate procedure provides at least some evidence of congressional intent to achieve uniformity of decision, encourage development of agency expertise, leave a wide berth for the exercise of agency discretion, and prevent disruption of the administrative process. [72]

Even where congressional intent is not expressed by statutory provision of a procedure for administrative appeals, judicial restraint and a concern for executive autonomy require consideration in the name of exhaustion of substantially the same factors that inform a determination of finality. Although the suspension regulations at issue in this case were propounded by Medicare, rather than provided by Congress, there is no need to reiterate the reasons previously articulated as a basis for the conclusion that the suspension order is a final one. The same considerations support our holding that Mount Sinai need not exhaust further administrative remedies before it will be entitled to judicial review.

The exhaustion rule has traditionally come into play, moreover, only when the administrative remedy provided is adequate to protect the claim which is asserted.[73] The remedy contained in the suspension regulations is deficient in two respects. In the first place, where

an aggrieved party must await at its risk such further enforcement procedures as the agency may choose to initiate, no viable remedy has usually been thought to be available. Frozen Food Express v. United States, 351 U.S. 40, 76 S.Ct. 569, 100 L.Ed. 910 (1956).[74] The suspension regulations under which defendants have proceeded against Mount Sinai authorize the subsequent review of a suspension order, but do not require in mandatory terms that one be held.[75]

Secondly, an administrative remedy is deemed inadequate if it fails to protect against irreparable injury.[76] Although that criterion is not satisfied simply by the expense of litigation, however great it may be, Myers v. Bethlehem Shipbuilding Corp., 303 U.S. at 51–52, there is authority for the view that financial injury resulting from the forfeiture of a right may be considered irreparable.[77] If the substantial financial loss that Mount Sinai stands to suffer from the suspension of even a portion of the payments rightfully due it for current services does not qualify, the non-financial injury to the community which will be occasioned by the resulting cutback of hospital services is surely irreparable. For these traditional reasons, therefore, the exhaustion doctrine does not present a bar to judicial review in this case.

However, Section 10(c) of the APA is equally dispositive of the exhaustion issue presented here. United States v. Consol. Mines & Smelting Co., 455 F.2d 432, 438–440 (9th Cir. 1971).[78] It provides that in the absence of an express statutory mandate to the contrary, a party subjected to otherwise final agency action that is immediately operative need not exhaust its administrative remedies as a prerequisite to judicial relief.[79]

72. *See* McKart v. United States, 395 U.S. at 193–195.

73. Jaffe, *supra* note 38, at 426.

74. *Cf.* Columbia Broadcasting Sys., Inc. v. United States, 316 U.S. 407, 62 S.Ct. 1194, 86 L.Ed. 1563 (1942); *see generally,* Jaffe, *supra* note 38, at 426 & nn. 6, 7.

75. *See* note 53 *supra.*

76. Jaffe, *supra* note 38, at 428–29.

77. Jaffe, *supra* note 38, at 429–30; *see* Deering Milliken, Inc. v. Johnston, 295 F.2d 856 (4th Cir. 1961).

78. *See* 1971 Duke Project, *supra* note 21, at 292–300; Davis, *supra* note 38, § 20.08.

79. Section 10(c) provides in pertinent part: "Except as otherwise expressly required by statute, agency action otherwise final is fi-

We are constrained to acknowledge, however, that from the time of the enactment of the APA until recently, the courts have continued to apply the exhaustion doctrine in light of its judicial genesis, leaving Section 10(c) "almost completely ignored."[80] Moreover, few commentators have perceived the provision as a substantial change in the law,[81] but have adhered to the view expressed in government reports[82] and commentaries[83] contemporary to the passage of the APA that the provisions of Section 10(c) "involve no departure from the usual and well-understood rules of procedure in this field."[84] Yet the legislative history plainly manifests a congressional purpose that may have been at variance with the judicial view of exhaustion.[85] Both the House and Senate reports delineate the intended opera-

tion of the provision, as well as the reasons for its enactment, by explaining that "[t]here is a fundamental inconsistency in requiring a person to continue 'exhausting' administrative processes after administrative action has become, and while it remains, effective."[86]

None of the statutory qualifications attached to the operation of this sound congressional policy apply to this case. The Medicare amendments contain no express statutory countermand to Section 10(c) that governs here, and the action before the court is, as we have ruled, a final one. Lastly, the decision to begin withholding 15 percent of plaintiff's Medicare payments, far from being stayed by rule or regulation pending subsequent review, is immediately operative.[87] Thus, both congressional intent, as it is manifested in the APA,

nal for the purposes of this section whether or not there has been presented *or determined* an application for a declaratory order, for any form of reconsideration, or, unless the agency otherwise requires by rule and provides that the action meanwhile is inoperative, for an appeal to superior agency authority."
5 U.S.C. § 704 (1970).

80. Davis, *supra* note 38, § 20.08 at 101; *see* 1971 Duke Project, *supra* note 21, at 293.

81. *But see* Davis, *supra* note 38, § 20.08 at 101.

82. S.Doc.No.248, 79th Cong., 2d Sess. 213, 230 (1946) (statement by Attorney General Tom C. Clark); *id.* at 369 (statement by Congressman F. Walters, Chairman, Subcommittee on Administrative Law, Committee on the Judiciary, during House proceedings prior to enactment of APA) [hereinafter cited as S.Doc.No.248].

83. *See* Brown, The "Federal Administrative Procedure Act," 1947 Wis.L.Rev. 66, 83; Netterville, The Administrative Procedure Act: A Study in Interpretation, 20 Geo. Wash.L.Rev. 1, 30 (1951); Reich, The Federal Administrative Procedure Act, 8 Fed.B. J. 7, 20 (1946); Comment, Judicial Review Under the A.P.A.—In Which Judicial Offspring Receive a Congressional Confirmation, 23 Notre Dame Law. 501, 524 (1948).

84. S.Doc.No.248, *supra* note 82, at 369.

85. In an amendment to the APA retained in the final version of S. 7, the House Committee on the Judiciary added the clause, "and

provides that the action meanwhile shall be inoperative." S.Doc.No.248, *supra* note 82, at 289. The footnote to the amendment demonstrates that the plain meaning of the added language was intended by the Committee. *Id.* at 289 n. 21.

86. S.Doc.No.248, *supra* note 82, at 213 (Senate report), 277 (House report).

87. The requirement that agency action be "inoperative" pending administrative review is thought to refer only to agency actions that would disturb the status quo. Davis, *supra* note 38, § 20.08 at 105–06; *see* 1971 Duke Project, *supra* note 21, at 294 & n. 13. This reading is supported by the conclusions of the Attorney General's office:

"The last clause of section 10(c) relates to two situations. First, pursuant to section 8(a), an agency may permit its hearing examiners to make initial decisions which will become the agency's final decisions in the absence of an appeal to or review by the agency. The last clause of section 10(c) permits an agency to require *by rule* that in such cases parties who are dissatisfied with the 'initial' decisions of hearing officers must appeal to the agency before seeking judicial review, but only if the agency further provides that the hearing officers' decisions shall be inoperative pending such administrative appeals. * * * (emphasis in original)

"The second and similar application of the last clause of Section 10(c) relates to appeals from agency decisions to a superior agency authority. For example, under some circumstances, it would seem that a

and the judicially created exhaustion doctrine independently require the conclusion that exhaustion is inapplicable as a bar to plaintiff's claim.

On the basis of our foregoing conclusions that neither the Medicare amendments nor sovereign immunity precludes federal question jurisdiction, and that none of the doctrines of ripeness, finality and exhaustion of administrative remedies forecloses nonstatutory review under the APA, we conclude that defendants' motion to dismiss must be denied, and it is so ordered. There being no genuine issue as to any fact material to the question, we will proceed to examine the merits of Mount Sinai's claim that defendants lacked statutory authority to issue the suspension order.

### III

### STATUTORY AUTHORITY

Defendants contend, first, that no explicit statutory authority for the challenged suspension order is necessary because the government has always had the common law and equitable right to extinguish a debt due it by withholding money it owes its debtor. Plaintiff re-

sponds that this argument begs the question it purports to answer because it assumes that the government possesses the statutory authority to determine that a debt exists.

■ The time honored proposition which defendants invoke does not require, however, that the government possess an express statutory grant of authority to determine that a debt is owed.[88] It is well settled that the sovereign has inherent authority to recover sums illegally or erroneously paid,[89] and that it cannot be estopped from doing so by the mistakes of its officers or agents.[90]

■ Yet, it cannot be doubted that Congress has the power to abrogate that ancient common law right either expressly or by implication if it chooses to do so for some overriding legislative purpose in the interest of the general public welfare.[91] What defendants' argument assumes, therefore, is that Congress did not in the Medicare amendments limit the government's authority to determine that payments illegally made may be recovered from a provider of services.

bureau or other subdivision within an agency may itself be the agency with respect to a particular function. In such a situation, it may be desired to require appeal from the bureau's decision to the department head or other 'superior agency authority' as a prerequisite to judicial review. Under section 10(c), such a requirement may be imposed, but only as in the case of required appeals from hearing officers' initial decisions, if the agency's decision is inoperative pending such appeal."
Atty. General's Manual on the Administrative Procedure Act 104, 105 (1947).

88. *E. g.* United States v. Wurts, 303 U.S. 414, 415, 58 S.Ct. 637, 82 L.Ed. 932 (1938); United States v. Bank of Metropolis, 15 Pet. 377, 401, 10 L.Ed. 774 (1841); Fansteel Metallurgical Corp. v. United States, 172 F. Supp. 268, 270–271, 145 Ct.Cl. 496 (1959); Anderson v. United States, 123 F.2d 13 (9th Cir. 1941).

89. *E. g.* Fansteel Metallurgical Corp. v. United States, 172 F.Supp. at 270–271; United States v. Wurts, 303 U.S. at 415; United States v. Carr, 132 U.S. 644, 651, 10 S.Ct.

182, 33 L.Ed. 483 (1890); United States v. Barlow, 132 U.S. 271, 281–282, 10 S.Ct. 77, 33 L.Ed. 346 (1889).

90. *E. g.* Federal Crop Ins. Corp. v. Merrill, 332 U.S. 380, 383–384, 68 S.Ct. 1, 92 L.Ed. 10 (1947); Posey v. United States, 449 F.2d 228, 234 (5th Cir. 1971); Heidt v. United States, 56 F.2d 559, 560 (5th Cir.), cert. denied, 287 U.S. 601, 53 S.Ct. 8, 77 L.Ed. 523 (1932).

91. The power of Congress under the general welfare clause to authorize spending of the public funds for a public purpose if not plenary, is nonetheless broad. U.S.Const. art. I, § 8; *see, e. g.,* Carmichael v. Southern Coal & Coke Co., 301 U.S. 495, 57 S.Ct. 868, 81 L.Ed. 1245 (1937). Even if it could be said that to prohibit any recoupment whatsoever of payments illegally made were such "a display of arbitrary power, not an exercise of judgment" as to exceed that power, Helvering v. Davis, 301 U.S. 619, 640, 57 S. Ct. 904, 908, 81 L.Ed. 1307 (1937), Congress surely has the authority to delimit when and from whom such recoupment may be obtained.

The Medicare amendments contain several indications that such an assumption may be unwarranted. The all-encompassing statutory scheme of this major piece of social welfare legislation is itself a substantial departure from the common law. So, too, is the fact that it limits the traditional liability of government officers and agents for making illegal payments of public funds.[92] Moreover, the Act requires the Secretary to enter into agreements in the nature of contracts with medical care facilities, and regulates the respective rights and duties of the parties in considerable detail.[93] Foremost among those provisions is the Secretary's right to make adjustments for overpayments in certain situations,[94] a stipulation Congress need hardly have enacted had it intended to give unlimited scope to the common law prerogative of government officers to recover illegal payments by set-off. We therefore turn to a consideration of the statute itself.

In promulgating the regulations upon which the suspension order is based, the Secretary relied on the substantive authority of Section 1815 of the Medicare amendments.[95] That section provides for payment of providers for services rendered, "with necessary adjustments on account of previously made overpayments or underpayments."[96] But to focus on the language of Section 1815 in isolation as blanket authority for any sort of administrative adjustment is to ignore its limited role within the entire statutory scheme.

Section 1814 of the Act requires that providers of services be paid only the "reasonable cost" of services rendered to Medicare beneficiaries.[97] Section 1861(v) requires that regulations be promulgated for the determination of "reasonable cost," and authorizes establishment of a method of payment based on cost estimates.[98] The first regula-

92. 42 U.S.C. §§ 1395h(g), 1395u(e) (1970).

93. 42 U.S.C. §§ 1395f(a), 1395h, 1395cc (1970).

94. 42 U.S.C. § 1395g (1970).

95. 37 Fed.Reg. 89 (Jan. 5, 1972).

96. Section 1815 reads as follows:
"The Secretary shall periodically determine the amount which should be paid under this part to each provider of services with respect to the services furnished by it, and the provider of services shall be paid, at such time or times as the Secretary believes appropriate (but not less often than monthly) and prior to audit or settlement by the General Accounting Office, from the Federal Hospital Insurance Trust Fund, the amounts so determined, with necessary adjustments on account of previously made overpayments or underpayments; except that no such payments shall be made to any provider unless it has furnished such information as the Secretary may request in order to determine the amounts due such provider under this part for the period with respect to which the amounts are being paid or any prior period."
42 U.S.C. § 1395g (1970).

97. 42 U.S.C. § 1395f(b) (1970). The 1972 amendments modify this requirement by authorizing providers to be paid "the lesser of

the reasonable cost of the services rendered or the provider's customary charge for such services." 42 U.S.C. § 1395f(b) (Supp. II, 1972), amending 42 U.S.C. § 1395f(b) (1970).

98. As originally enacted, Section 1861(v)(1) provided:
"The *reasonable cost* of any services shall be determined in accordance with regulations establishing the method or methods to be used, and the items to be included, in determining such costs for various types or classes of institutions, agencies, and services; except that in any case to which paragraph (2) or (3) applies, the amount of the payment determined under such paragraph with respect to the services involved shall be considered the reasonable cost of such services. In prescribing the regulations referred to in the preceding sentence, the Secretary shall consider, among other things, the principles generally applied by national organizations or established prepayment organizations (which have developed such principles) in computing the amount of payment, to be made by persons other than the recipients of services, to providers of services on account of services furnished to such recipients by such providers. *Such regulations* may provide for determination of the costs of services on a per diem, per unit, per capita, or other basis,

tions promulgated when the Medicare amendments became effective made immediate use of that authority.[99]

More importantly, Section 1861(v) clarifies the intended scope of the Secretary's authority under Section 1815 to make "adjustments" for overpayments or underpayments. It not only contemplates, but expressly mandates, that provision be made in the Medicare regulations for "suitable retroactive *corrective adjustments* where, for a provider of services *for any fiscal period*, the aggregate reimbursement produced by the methods of determining *costs* proves to be either inadequate or excessive." [100] Thus, the adjustments envisioned by the Act are intended only to reconcile amounts determined to be due as reasonable costs with amounts actually paid on the basis of cost estimates at the end of the fiscal period. The initial regulations issued by the Secretary accord with this congressional mandate.[101]

Viewed within the framework of the statutory scheme, therefore, it becomes apparent that the authorization upon which defendants rely in Section 1815 for "necessary adjustments" is necessitated by two other provisions of that section. On the one hand, Section 1815 requires the Secretary to *"periodically* determine the *amount which should be paid* [under Part A] to each provider of services with respect to the services furnished by it . . . ." On the other, the section mandates that "the provider of services shall be *paid* . . .

may provide for using different methods in different circumstances, *may provide for the use of estimates of costs of particular items or services,* and may provide for the use of charges or a percentage of charges where this method reasonably reflects the costs. *Such regulations shall* (A) take into account both direct and indirect costs of providers of services in order that, under the methods of determining costs, the costs with respect to individuals covered by the insurance programs established by this title will not be borne by individuals not so covered, and the costs with respect to individuals not so covered will not be borne by such insurance programs, and *(B) provide for the making of suitable retroactive corrective adjustments where, for a provider of services for any fiscal period, the aggregate reimbursement produced by the methods of determining costs proves to be either inadequate or excessive."* 42 U.S.C. § 1395x(v)(1) (Supp. I, 1965) (emphasis added). This section, too, was amended in 1972 to define "reasonable cost" as the "cost actually incurred" by the provider. 42 U.S.C. § 1395x(v)(1) (Supp. II, 1972), amending 42 U.S.C. § 1395x(v)(1) 1970).

**99.** The regulations provide, in pertinent part: *"Amount and frequency of payment.* Title XVIII of the act states that providers of services will be paid the reasonable cost of services furnished to beneficiaries. Since actual costs of services cannot be determined until the end of the accounting period, *the providers must be paid on an estimated cost basis* during the year. While the law provides that interim payments shall be made no less often than monthly, intermediaries are expected to make payments on the most expeditious basis administratively feasible. Whatever estimated cost basis is used for determining interim payments during the year, *the intent is that the interim payments shall approximate actual costs as nearly as is practicable so that the retroactive adjustment based on actual costs will be as small as possible."* 20 C.F.R. § 405.454(b), 31 Fed.Reg. 14819 (Nov. 22, 1966) (emphasis added).

**100.** 42 U.S.C. § 1395x(v) (1970) (emphasis added).

**101.** In pertinent part, the regulations stated: *"Retroactive adjustment.* (1) Title XVIII of the Act provides that providers of services shall be paid amounts determined to be due, but not less often than monthly, with necessary adjustments due to previously made overpayments or underpayments. Interim payments are made on the basis of estimated costs. *Actual costs reimbursable to a provider cannot be determined until the cost reports are filed and costs are verified.* Therefore, a retroactive adjustment will be made at the end of the reporting period to bring the interim payments made* to the provider during the period *into agreement with the reimbursable amount payable* to the provider for the services rendered to program beneficiaries during that period." 20 C.F.R. § 405.454(f)(1) (1973), 31 Fed. Reg. 14819 (Nov. 22, 1966) (emphasis added).

*not less often than monthly* and prior to audit' or settlement by the General Accounting Office." [102] The provision for adjustments due to overpayments or underpayments simply recognizes and reconciles the conflicting demands of Section 1815 for periodic settlement of the reasonable cost due when the necessary data becomes available, yet for sufficient frequency of payment to generate an adequate cash flow for the provider.

If Section 1815 may be construed to authorize adjustments for purposes other than that of reconciling cost determinations, reliance upon it to justify the challenged suspension regulations presents two problems arising from its statutory context. First, unlike the minor adjustments envisioned by the Act, the suspension regulations issued in 1972 contemplate cutbacks amounting to a complete termination of all payments due a provider. They state that current payments may be suspended *"in whole or in part."* [103] Yet the first regulations promulgated after the Act's passage to implement the very provision upon which the regulations rely states that "the intent is that the interim payments shall approximate actual costs as nearly as practicable so that the retroactive adjustment based on actual costs will be *as small as possible."* [104] The scope of the suspension regulations therefore appears to exceed that of the statutory authorization for adjustments.

Secondly, the retroactivity intended by Section 1861(v) to be accorded corrective adjustments is limited by its terms to "any fiscal period." [105] Although Section 1815 commits the question of a suitable period within which to complete reasonable cost determinations to the Secretary's discretion, he has exercised that authority. The initial regulations issued provided that "interim payments to providers will be made for services throughout the year, with final settle-

ment on a retroactive basis at the end of the accounting period." [106] Thus, although the Act contemplates that adjustments will be retroactive, retroactivity is limited to the "end of the accounting period." It does not appear to extend, as defendants would have the regulations extend here, to permit the reopening of final settlements consummated up to six years ago.

Mount Sinai consequently argues that the adjustments for overpayments and underpayments resulting from interim estimates of reasonable cost provide no statutory basis for the challenged suspension regulations. Plaintiff points out that the suspension procedures are not designed to permit reopening of questions of reasonable cost as was contemplated in Sections 1815 and 1861(v) of the Act, but rather to allow reconsideration of questions of coverage.

There can be no dispute that defendants have neither administratively determined nor subsequently asserted here that Mount Sinai has overcharged for its services. To the contrary, in accordance with the suspension regulations, they seek only to recoup sums previously paid to Mount Sinai on the basis of a subsequent determination that services concededly rendered are not within the coverage of the Medicare amendments.

Defendants contend, however, that because Section 1815 does not expressly preclude retroactive adjustments on questions of coverage, as opposed to those plainly envisioned for cost adjustments, such inconsistencies as have been noted should not be deemed to bar administrative adaptation of the adjustment procedure to meet contingencies unforeseen at the time of the passage of the Medicare amendments. The force of the argument that when it enacted the program, Congress must have intended to provide wide latitude in the adminis-

102. 42 U.S.C. § 1395g (1970) (emphasis added).

103. 20 C.F.R. § 405.370(a) (1973) (emphasis added).

104. 20 C.F.R. § 405.454(b) (1973) (emphasis added).

105. 42 U.S.C. § 1395x(v)(1) (1970).

106. 20 C.F.R. § 405.405(c) (1973).

tration of Medicare certainly cannot be ignored.[107]

Indeed, the suspension regulations are not predicated solely on Section 1815, but also rely on the authority of Sections 1102 and 1871 of the Act.[108] Read together, these two sections authorize the promulgation of such regulations as may be necessary to the efficient administration of the Medicare program, so long as they are not inconsistent with the statute.[109] Nonetheless, upon careful consideration of the entirety of the Act, the court is persuaded that the suspension regulations are fundamentally at odds with the intent of Congress as it is manifested by the totality of the statutory scheme.

The general purpose of the Social Security Act amendments which established Medicare was to create a system of medical insurance, just as the Act itself provides retirement insurance, for individuals eligible for social security benefits.[110] Like any insurance agreement, the legislative contract embodied in the Act is primarily concerned with defining the respective rights and duties of the governmental insuror and the insured beneficiaries.

For its part, the government is obligated to provide specified medical benefits to senior citizens eligible to partici-pate by virtue of prior contributions to the program through payroll taxes which are in the nature of insurance premium payments. All those who meet the eligibility requirements are entitled, under Part A of the program which concerns us here, to in-patient hospital services, post-hospital extended care services and post-hospital home health services.[111] As with most insurance plans, the kind of medical service and the maximum duration of payments are subject both to general limitations,[112] and to specific exclusions from coverage,[113] including one for services "not reasonable or necessary" that is the basis of the controversy here.[114]

The proprietary right corresponding to the governmental obligation is not left unprotected by the Act. In recognition of the accrued interest of former payroll taxpayers to Medicare benefits, Section 1869 provides a right to a hearing and judicial review not only in disputes over eligibility for enrollment in the program, but also, within certain monetary limitations, in controversies over the "amount of benefits" payable.[115] Subject to the applicable dollar limitations, therefore, hearing and appeal may be obtained by a beneficiary dissatisfied with coverage determinations that operate to reduce the amount of his benefits.[116]

---

107. *See, e. g.,* Mourning v. Family Publications Serv., Inc., 411 U.S. 356, 369, 93 S.Ct. 1652, 36 L.Ed.2d 318 (1973) ; Thorpe v. Housing Authority, 393 U.S. 268, 280–281, 89 S.Ct. 518, 21 L.Ed.2d 474 (1968) ; *see also* American Trucking Ass'n, Inc. v. United States, 344 U.S. 298, 73 S.Ct. 307, 97 L.Ed. 337 (1953). *But see* NLRB v. Brown, 380 U.S. 278, 291, 85 S.Ct. 980, 13 L.Ed.2d 839 (1965) ; Celebrezze v. Kilborn, 322 F.2d 166 (5th Cir. 1963).

108. 37 Fed.Reg. 89 (Jan. 5, 1972).

109. Section 1102 provides :
"The Secretary of the Treasury, the Secretary of Labor, and the Secretary of Health, Education and Welfare, respectively, shall make and publish such rules and regulations, *not inconsistent with this chapter,* as may be necessary to the efficient administration of the functions with which each is charged under this chapter.

42 U.S.C. § 1302 (1970) (emphasis added). Section 1871 provides, in pertinent part :
"The Secretary shall prescribe such regulations as may be necessary to carry out the administration of the insurance programs under this subchapter. . . . "
42 U.S.C. § 1395hh (1970).

110. 42 U.S.C. §§ 426, 402 (1970).

111. Supplemental benefits may be obtained on a voluntary basis under Part B of the program through payment of a minimal monthly premium. 42 U.S.C. § 1395j et seq. (1970).

112. 42 U.S.C. § 1395d (1970).

113. 42 U.S.C. § 1395y (1970).

114. 42 U.S.C. § 1395y(a)(1) (1970).

115. 42 U.S.C. § 1395ff(b) (1970).

116. Although agency policy on beneficiary appeals was not formally codified by the Secre-

By authorizing individual consideration of all Medicare controversies under Part A over the proper amount of benefits, therefore, Section 1869 of the Act mandates a case-by-case review of disputes over coverage. If the Secretary determines that he must decline to pay for certain services on the ground that they are not medically reasonable or necessary, he must so inform the beneficiary in order that hearing and appeal rights may be exercised. Thus, the primary parties to a dispute over coverage are the Secretary and the individual beneficiary.

By comparison, providers of services like Mount Sinai play an incidental, if important, role in the Medicare program generally, and in disputes over coverage between the governmental insuror and beneficiaries in particular. Section 1802 of the Act is designed to assure maximum freedom to individual beneficiaries in securing health care from institutions of their own choosing.[117] The only limitation on their choice is that the institution selected must have met the minimal requirements for participation in the Medicare program as a provider of services.[118] Thus, Medicare patients stand in much the same relationship to providers of services as do patients with private medical insurance. They request medical services and become obligated to pay for those determined not to be covered by the program.[119]

As is true of the role of hospitals under private medical insurance plans, providers of services under Medicare have nothing whatever to do with disputes between the governmental insuror and the beneficiary over whether services rendered are, or are not, covered by the program. Section 1869 of the Act, which provides hearings and appeals in such disputes for the beneficiary, confines providers of services to appeals directly affecting their eligibility to furnish services under the Medicare program.[120]

However, providers of services do have an interest in Medicare coverage disputes beyond that which they would have if a private insuror were involved. Section 1866 of the Act requires health care facilities to agree, as a condition of their participation in the program, not to charge Medicare beneficiaries for covered services.[121] Violation of this agreement is grounds for termination of a provider.[122] Yet Medicare beneficiaries may be charged by providers for services that are not covered by the program.[123] Consequently, a provider's ability to collect from an individual beneficiary without threat of termination depends upon resolution of the coverage issue.

Of course, some coverage questions may be determined by a provider at the time of a patient's discharge without fear of jeopardizing its status as a Medicare provider. Thus, it is a relatively straightforward matter at the time of a beneficiary's release for providers to compute charges for the noncovered Medicare deductibles specified by the Act.[124] But it is quite a differ-

---

tary until 1972, the regulations now expressly recognize a beneficiary's right to appeal any issue "having a present or potential effect on the amount of benefits to be paid under Part A," 20 C.F.R. § 405.704(1) (1973), including the "coverage of items and services furnished," 20 C.F.R. § 405.704(a) (1973), and the "medical necessity of services." 20 C.F.R. § 405.-704(k) (1973).

117. 42 U.S.C. § 1395a (1970).

118. 42 U.S.C. § 1395cc (1970).

119. 42 U.S.C. § 1395cc(a)(2) (1970).

120. 42 U.S.C. § 1395ff(c) (1970).

121. 42 U.S.C. § 1395cc(a)(1)(A) (1970).

122. 42 U.S.C. §§ 1395cc(a)(1)(A), 1395cc (b)(2) (1970); 20 C.F.R. §§ 405.614(a)(1), 405.607(a)(1) (1973).

123. 42 U.S.C. § 1395cc(a)(2) (1970).

124. 42 U.S.C. § 1395cc(a)(2)(A) (1970). Because of the possibility of computational errors, Section 1866 requires providers "to make adequate provision for return . . . of any moneys incorrectly collected from [an] individual" beneficiary. 42 U.S.C. § 1395cc(a)(1)(B) (1970).

ent matter for a provider to attempt to determine at time of discharge whether services rendered are excluded from coverage because they are "not reasonable or necessary." [125] The Medicare program, as originally enacted, placed its reliance on the attending physician to determine in the first instance whether services provided were "medically required and . . . necessary" to the beneficiary's diagnosis or treatment.[126] Consequently, a hospital may ignore the medical determination of the treating physician and bill a Medicare patient for such services at the time of his discharge only at the risk of termination from the Medicare program.

Providers are therefore not free to charge Medicare beneficiaries at the time of their release for services which may become the subject of a coverage dispute. Consequently, where a controversy over coverage arises between the Secretary and a beneficiary, the provider must be paid for its services at some point. The question is when and by whom. The logic of defendants' position compels the answer that payment may initially be made to the provider by Medicare, but that it will be subject to recoupment if, after hearing and appeal, the services rendered are finally determined to fall beyond the scope of the program's coverage. The provider would then presumably be left to its own devices to collect from its former patient.

Such an interpretation of the Medicare amendments presents at least three major difficulties. In the first place, if Congress had intended that Medicare operate in the manner suggested, participation in the program as a provider of services would be economically irrational. Providers would be confronted with the problems of collecting from beneficiaries for services long since rendered because of the delays in resolution of coverage disputes, delays which might amount to a matter of years for disputes over sizable sums for which judicial review is available. In view of the advanced age and precarious health of the beneficiary population, such delays could jeopardize a provider's ability to collect for its services. Because of this ultimate uncertainty that payment could be obtained, health care facilities would be discouraged from joining Medicare, thereby defeating the basic program objective of making health care widely available to eligible beneficiaries.

Secondly, such a system of payment followed by recoupment, if it would not be wasteful of administrative time and effort, does not square with the Act's procedure for resolving coverage disputes. The provider's interest in the coverage issue would be direct and immediate because it would stand to lose a Medicare payment previously received. The beneficiary's interest would be remote by comparison because unlike an individual privately insured, he would not himself first have to pay the hospital, then seek to recover from his insuror. Yet despite the substantial interest providers would have in the outcome of coverage disputes under such a system, the Act excludes them entirely from the coverage determination process.

Lastly, if it had indeed been the intent of Congress to leave the interest of providers in securing payment for their services unprotected where coverage questions arise, it is difficult to explain the Act's solicitude for that interest in special situations. Thus, Section 1814 expressly provides that a hospital is entitled to receive payments from Medicare for services rendered in good faith to a beneficiary before it is notified that its patient's in-hospital stay has exceeded the limits of the program's coverage due to prior stays in other hospitals.[127] Similarly, Section 1866 authorizes the

125. 42 U.S.C. § 1395y(a)(1) (1970).

126. 42 U.S.C. § 1395f(a)(2)(A) (Supp. I, 1965), as amended 42 U.S.C. § 1395f(a)(3) (1970).

127. 42 U.S.C. § 1395f(e) (1970).

Secretary to decide to stop payments for any long-stay patients in lieu of terminating providers that fail to make timely review of such cases, but only after reasonable notice and opportunity for a hearing on his decision, and only if payment is made for an initial period of care.[128]

Even if the foregoing difficulties with defendants' position could be overlooked, we may not ignore one salient fact. The Medicare amendments make it clear that Congress did not intend to require providers to await notification of the final outcome of coverage disputes before attempting to collect from beneficiaries as best they can. Rather than leave to administrative discretion the related questions of when and from whom a provider may obtain payment in case of a coverage dispute, Section 1862 provides a simple answer: Medicare payments to providers may not be made at any time for services which are not covered.[129] If Medicare intends to dispute an item or service arguably excluded from coverage by Section 1862(a), therefore, it must refuse to pay when first billed by the provider.[130]

That this was the intent of Congress is evidenced by a distinction between exclusions from coverage drawn by the Medicare amendments. Unlike Section 1862(a) with which we are here concerned, Section 1862(b) expressly authorizes provisional payments to providers of services subject to subsequent recoupment.[131] Advancement of such funds is limited, however, to cases in which payment from a state or federal workmen's compensation plan cannot reasonably be anticipated at the time Medicare receives the provider's bill. Moreover, Section 1862(b) forbids recoupment until the provider has actually obtained payment for its services, thereby protecting it from any of the uncertainties of collection.

Yet neither the provisional payment and recoupment procedure, nor its safeguards, are to be found among the remaining exclusions from coverage contained in Section 1862(a). If Congress had intended such a procedure to apply to them, much less to authorize the adaptation of one by administrative fiat, the statute would so provide. Thus, not only is the legislative intent of Section 1862(a) readily discernible from the language employed, the time-honored maxim of statutory construction that "expressio unius est exclusio alterius" compels the conclusion that the recoupment procedure advanced by defendants is inconsistent with the Medicare amendments. FTC v. Sun Oil Co., 371 U.S. 505, 514–515, 83 S.Ct. 358, 9 L.Ed.2d 466 (1963); J. Ray McDermott & Co. v.

128. 42 U.S.C. § 1395cc(d) (1970).

129. The statutory language of Section 1862(a) pertinent to defendants' charge of overutilization is clear and direct:

"Notwithstanding any other provision of this subchapter, *no payment may be made* under part A or part B *for any expenses incurred* for items or services—

"(1) *which are not reasonable and necessary* for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member."

42 U.S.C. § 1395y(a)(1) (1970) (emphasis added). As originally enacted, Section 1862(a) proceeded to enumerate eleven other basic exclusions from Medicare coverage.

130. The provider can therefore proceed immediately to charge its Medicare patient for the disputed services without risk of termination of its status for collecting for covered services and without the prejudice to its

ability to collect that might be occasioned by a lengthier delay.

131. Section 1862(b) provides:

"Payment under this subchapter may not be made with respect to any item or service to the extent that payment has been made, or can reasonably be expected to be made (as determined in accordance with regulations), with respect to such item or service, under a workmen's compensation law or plan of the United States or a State. *Any payment* under this subchapter with respect to any item or service *shall be conditioned on reimbursement* to the appropriate [part A or part B] Trust Fund established by this subchapter *when notice* or other information *is received that payment* for such item or service *has been made* under such a law or plan."

42 U.S.C. § 1395y(b) (1970) (emphasis added).

Vessel Morning Star, 457 F.2d 815, 818 (5th Cir. 1972) (en banc), cert. denied 409 U.S. 948, 93 S.Ct. 292, 34 L.Ed.2d 218; Bott v. American Hydrocarbon Corp., 458 F.2d 229, 233 (5th Cir. 1972).

We conclude, therefore, that the Act bars provisional payments subject to recoupment from the provider if Medicare subsequently determines that the services rendered are excluded from coverage by Section 1862(a). It follows from the prohibition on recoupment that payment of charges for items or services constitutes a final determination as to the provider that they are not excluded by Section 1862(a) from coverage.[132]

Likewise, the ban on provisional payments in Section 1862(a) encompasses any scheme of administrative adjustments to recover payments erroneously made to providers for items or services it excludes from coverage. Defendants' reliance on Section 1815 as authority for adjustments in payments to correct erroneous coverage determinations is therefore misplaced. Section 1815, a cost provision permitting adjustments to correct overpayments resulting from regular interim payments of estimated costs, cannot authorize what Section 1862(a) forbids in determinations of coverage.

Coverage determinations and cost determinations therefore can be seen to derive from two separate grants of authority in the Act which differ significantly and do not overlap. Once payment for an item or service is extended, Section 1862(a) prohibits any effort to reopen the coverage determination and retrieve the payment from the provider. However, the Secretary is authorized by Section 1815 to adjust the amount of the payment for such a covered item or service in order to square it with a subsequent determination of the reasonable cost which the provider may properly charge.

This fundamental distinction between coverage and cost determinations is totally ignored by the suspension order issued to Mount Sinai on May 10, 1973 and by the regulations on which it was based. The challenged regulations were applied in this case to recoup payments made to plaintiff between 1966 and 1972 for items or services subsequently alleged to be excluded from Medicare coverage by Section 1862(a). Because a coverage, not a cost determination is at issue, Section 1815 provides no authority for application of the suspension regulations. Nor can the agency's broad discretion under Sections 1102 and 1871 to make rules necessary to the administration of the program expand the grant in Section 1815 to authorize what is not only inconsistent with, but forbidden by Section 1862(a). We hold, therefore, that the suspension order was unauthorized by the Act, and that application of the suspension regulations to recoup the payments made from July 1, 1966, through December 31, 1971, to providers

---

132. We note that payment for items or services does not necessarily represent a final coverage determination as to the beneficiary. If payment of a provider's charges is refused by Medicare, of course, the initial determination that the items or services are excluded from coverage by section 1862(a) does not become final until the beneficiary has exhausted such rights as he may have under section 1869 to administrative hearing and judicial review. If payment is made, on the other hand, the question is more difficult.

Mount Sinai suggests that Medicare can recover from the beneficiary for a mistaken payment to a provider for non-covered services under authority of Sections 1869 and 1870 of the Act. 42 U.S.C. §§ 1395ff, 1395gg (1970). Section 1869, however, simply authorizes appeals by beneficiaries from adverse "determinations"; it does not provide authority for reopening and reversing a prior determination that an item or service is covered by Medicare. Similarly, although Section 1870 requires that recovery must be sought first from the provider, then from the beneficiary where "more than the correct amount is paid," it does not itself authorize the determination of the correct amount. We think the provision in Section 1862(a) that "no payment may be made" for excluded items or services must be understood to protect beneficiaries as well as providers, absent an express indication to the contrary, from the reopening of coverage determinations due to prior mistakes in the payment of providers.

for items or services allegedly excluded from coverage by Section 1862(a) lacked statutory authority.

We are encouraged in this construction by the 1972 amendments to the Social Security Act,[133] which expressly provide both the statutory authority and procedural means for correcting abuses of the Medicare program by providers of services.[134] Effective October 30, 1972,[135] providers have been required to submit evidence to the Professional Standards Review Organizations (PSRO's) created by the amendments to document their obligatory assurances that services rendered meet professionally recognized standards of quality and are provided only when and to the extent medically necessary.[136] Upon receipt of a PSRO determination that a provider has been unwilling or unable to meet its obligation to avoid overutilization,[137] the Secretary may terminate the provider from the Medicare program,[138] or recoup amounts of up to $5,000 previously paid for such unnecessary services.[139] In either case, the amendments insure that the provider will be accorded the procedural safeguards of an administrative hearing and judicial review.[140]

In enacting the 1972 amendments, moreover, Congress recognized the Secretary's previous lack of authority under the Act either to impose sanctions for overutilization or to recover payments made to providers for unnecessary services. The legislative history directly expresses a concern for this hiatus in the statutory scheme.[141] Of course, such interpretive pronouncements accompanying subsequent amendments to a statute do not provide a consistently reliable basis for inferring the intent underlying a prior Act of Congress, and we need not rely on them here. Waterman S. S. Corp. v. United States, 381 U.S. 252, 269, 85 S.Ct. 1389, 14 L.Ed.2d 370 (1965); United States v. Price, 361 U.S. 304, 312, 80 S.Ct. 326, 4 L.Ed.2d 334 (1960). Nonetheless, they have been accorded at least some consideration in this circuit as a "secondarily authoritative expression of expert opinion." Bobsee Corp. v. United States, 411 F.2d 231, 237 n. 18 (5th Cir. 1969).[142]

133. Act of Oct. 30, 1972, Pub.L.No. 92–603, Title II, § 249F(b), 86 Stat. 1442, amending 42 U.S.C. § 1320 (1970) (codified at 42 U. S.C. § 1320c (Supp. II, 1972)).

134. 42 U.S.C. § 1320c–9 (Supp. II, 1972).

135. The amendments have only prospective effect, and therefore do not apply to the present controversy. *See* note 6 *infra.*

136. 42 U.S.C. § 1320c–9(a)(1) (Supp. II, 1972).

137. 42 U.S.C. § 1320c–6 (Supp. II, 1972).

138. 42 U.S.C. § 1320c–9(b)(2) (Supp. II, 1972).

139. The amendments explicitly authorize recoupment by set-off:
"Such amount may be deducted from any sums owing by the United States (or any instrumentality thereof) to the person from whom such amount is claimed."
42 U.S.C. § 1320c–9(b)(3) (Supp. II, 1972).

140. 42 U.S.C. § 1320c–9(b)(4) (Supp. II, 1972).

141. The report of the Senate Finance Committee states:
*"Present law does not authorize the Secretary to withhold future payments for services furnished by an institutional provider of services, a physician, or any other supplier who either abuses the program or endangers the health of beneficiaries, although payment for past or current claims may be withheld on an individual basis where the services are not reasonable or necessary for treatment of illness or injury or where the supplier fails to provide the necessary payment information."*
S.Rep.No.92–1230, 93rd Cong., 2d Sess. 200 (1972) (emphasis added). As the report recognized, therefore, although the Secretary had been authorized by Section 1814 to withhold payment on account of overutilization on a case-by-case basis as he processed individual claims, 42 U.S.C. § 1395f(a) (1970), he lacked statutory authority to withhold payment of future claims for medically necessary services in order to recoup past overpayments resulting from program abuses.

142. *Cf.* Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 380–381, 89 S.Ct. 1794, 23 L. Ed.2d 371 (1969); FHA v. Darlington, Inc., 358 U.S. 84, 90, 79 S.Ct. 141, 3 L.Ed.2d 132 (1958).

Because of the view we take on the issue of statutory authority, we need not reach the question of the constitutionality of the suspension regulations. Mount Sinai is entitled to judgment on the merits and to a permanent injunction prohibiting unauthorized efforts by the Secretary or his agents to recoup Medicare payments the hospital received prior to January 1, 1972, on the basis of a subsequent determination that the items or services rendered were excluded from Medicare coverage by Section 1862(a) of the Act. Plaintiff shall therefore prepare in accordance with this opinion a final judgment with fees and costs taxed according to law. It is so ordered.